# DECISIONS

OF THE

# SUPREME COURT OF MISSOURI.

## SECOND JUDICIAL DISTRICT,

### JUNE TERM 1840.

---

PLUMMER, deft. & appellant vs. THE STATE pltff. & appellee.

Indictment for murder,—first count charged that deft. "feloniously, wilfully, of his malice aforethought and by lying in wait" assaulted &c.—second count, laid the manner and form of killing same as first count, but substituted the words "deliberately and premeditatedly," in lieu of the words "by lying in wait." The jury returned a verdict that defendant was not guilty of murder in either degree in manner and form as charged against him in either count of the indictment, but further found him guilty of manslaughter in the third degree *in manner and form as charged against him in the indictment.* Held, that both under our statute, and at common law, the defendant may be found guilty of manslaughter, on an indictment for murder, as the former offence is included in the latter.—The jury by their verdict negatived the malice aforethought; lying in wait; premeditation, and deliberation, and found the felonious homicide alone, committed in the manner and form charged. (See The State vs. Watson 5, V. Mo. R. p. 497.)

Appeal from the circuit court of Lincoln county.

*Bates for Appellant.*

That the court erred in refusing to grant a new trial because,

1st. The testimony shows a plain case of excusable homicide, this covers the three first reasons assigned for a new trial.

JUNE TERM
1840.

Plummer
vs
The State.

2nd. The verdict is against law; it being settled by this court that on an indictment for murder, the party may be convicted of manslaughter, I shall not again seek to stir that question, but here the verdict is, guilty of manslaughter in the third degree in manner and form, as charged in the indictment, when there is no such charge.

3rd. The verdict is against the spirit and effect of the instructions; applying the legal effect of the instructions to the facts, the defendant ought to have been acquitted.

4th. The second instruction moved by defendant, ought to have been given, because, although a party indicted for murder may be convicted of manslaughter, still, the jury are not bound to do more than to affirm or deny the guilt of the party as charged.

*G. Porter for The State.*

Rev. Stat. title Crimes and Punishments Art. I, sec. 4 and sec. 13 of the same title and article. Also Starkie's Ev. 2 vol. p. 523, and Mo. Dec. vol. 5. State vs. Watson, and State vs. Mallerson

*Opinion of the Court delivered by Napton Judge.*

Philemon Plummer was indicted for the murder of Joseph Plummer, by the grand jury of the county of Lincoln, at the April term of the circuit court. The first count charged, that defendant feloniously, wilfully, of his malice aforethought, and by lying in wait, assaulted the said Joseph Plummer; and with a large stick did feloniously &c., strike the said Joseph, in and upon, the right side of the head of the said Joseph, and inflicted a mortal wound, of which the said Joseph immediately died; this count concludes in the usual form. The second count, lays the manner and form of the killing in the same way as in the first count, but substitutes the words "deliberately and premeditatedly," in lieu of the words "by lying in wait." On this indictment the jury returned a verdict, that the defendant was not guilty of murder in either degree, in manner and form as charged against him in either count of said indictment, but further found, that defendant was guilty of manslaughter in the third degree, in manner and form as charged against him in the indictment, and assessed his punishment to confinement in the

penitentiary of the state for the term of three years. The defendant by his counsel then moved the court to set aside the verdict and grant a new trial, for the following reasons: 1. The jury found their verdict against the evidence in the cause. 2. The jury found against the weight of evidence. 3. The jury found without sufficient evidence. 4. The jury found against law. 5. The jury found against the instructions of the court. 6. The court mis-directed the jury and refused to give proper instructions. This motion was overruled by the court, and the case is brought here by appeal. From the bill of exceptions, the following details of the material testimony are copied: A sister of the deceased, Anna Barker, deposed, that on the Sunday before the homicide was committed, the children of Phil. Plummer, defendant, passed by her house, when a black child, a child of the negro woman *Martha*, snatched the bonnet of one of Ph. Plummer's children, and was running away with it; witness gave back the bonnet, and slapped the negro child. The children of P. Plummer went home and reported that one of them had been whipped by the negro child with a switch, while Caty Plummer (wife of deceased,) held a stick over its head to prevent its making resistance. Shortly after this, Phil. Plummer's little son came to witnesses house to get a pair of sheep shears, when witness taxed him with the lies he had told. On Friday evening, Phil. Plummer came to witness' house, and said he understood there was a fray among the children, and wished to know the truth; when some conversation ensued between witness and her brother, the defendant, in relation to this matter; in the course of this conversation, defendant declared that great injustice had been done his children; that lies had been told on them; that if his father upheld the negro woman, he (the father,) would tell a lie as well as the rest. He declared, according to the witness, that *Marth*, the negro woman spoken of, had been ill treating his children for a long time, and he would go over next morning and give the black bitch a hundred lashes, and whoever upheld her, he would lay out with a dirk knife, or any thing he could lay hands on. He declared to witness, that in the winter at hog killing time, Jo's (meaning his bro-

ther the deceased,) wife, drove off his children, and he had put his dirk in his bosom, and went over to spill her blood. He said that when his children went over to Jo's, Jo's children would ask if they were akin to them, to which their mother (Jo's wife,) would say no, they are negroes, or mulattoes; and Jo would sit there laughing like a fool. This witness testified further, that on the next day after this conversation. between her and Philemon Plummer, which was Saturday about two or three o'clock in the evening, the negro woman, *Marth*, came to her house, and called and told her that Phil. the defendant, had come to the old mans to whip her about the children. She, (the witness,) and Katy Plummer, the wife of Jos. Plummer, started to go, and Joseph Plummer followed, she found the parties in the treading yard, where her father and another brother John, were treading out oats; defendant was sitting on a hogshead with a hickory switch in his hand, witness addressed him and declared she had come to settle the dispute, he replied with an oath, and made at witness with his switch drawn in a menacing attitude &c.; witness caught the switch; he jerked it from her, and drew it again, when Joseph Plummer spoke and said "dont strike her," and as he spoke stooped to come through the bars; (the top rail being up and the rest down,) Phil. said, "damn you, do you take it up," and drew a pitchfork, and struck Joe on the head while he was stooping, Joe did not see the blow struck witness declared, because she heard him, when he came to ask his wife what ailed his head; the blow knocked Joe down for dead; after a while, when rubbed with camphor, he revived and with the aid of his wife walked into the house; shortly after he became very sick and vomited; never spoke after dark and died before morning. Witness declared further, that when the blow was struck she tried to catch the fork but could not, as her father had hold of her by the arm and back. Phil. tried to strike her with the fork; she, witness, did not strike him at all; after he had struck her brother Joe, she picked up a tomahawk that lay on the hogshead, and tried to strike him with it, but her father caught her arm. The pitch fork produced in court and identified by witness, was a forked stick, or sap-

JUNE TERM
1840.

Plummer
vs.
The State.

ing, 6 or 7 feet long and about as thick as a man's wrist, roughly shaved as with a drawing knife. Mrs. Barker further declared, that she did not see her father take hold of any person but herself, and after the blow, John, who caught the stick from defendant, said to him "go home, you have killed your poor innocent brother," and Phil. replied "By God, I dont care if I have."

George Gale testified: that on Saturday, the day Joseph Plummer was killed, he went to old Mr. Plummer's to tread out oats: Philemon Plummer came there, the old man and John being there, Philemon said, "Daddy, you, or John, one, has to fight me; *Marth* (the negro woman) has been telling lies on my children, and Katy Plummer and Anna Barker made the black beat them with sticks"; the black woman came out and said something; Phil. shook a hickory at her, and told her to hush her mouth, or he would give her five hundred lashes. She went back, and Phil. and the old man talked a good while, but witness paid no attention to the conversation; about two hours after Phil. had come there, he, defendant, looked down the road, and said "there, *Marth* has got Katy and Anna to come and make a fuss"; he then told John to whip her, but John refused; he said he defendant, would, and made some motion to that purpose, but was pulled back by his father; he then sat on the hogshead, with his back to the women as they came up. Mrs. Barker (the first witness,) said she had come up to finish the scrape; defendant said he was ready; she replied she was too, and came through the bars, and struck him two or three times in the mouth. He (defendant,) tried to push her away, he then caught hold of her, held both of her hands with one of his and raised his switch as if to strike her, his father told him not to strike her, and he did not, witness then saw Joseph Plummer come in a run, with a stone in his hand, and defendant caught the pitch fork which the old man had dropped, (or snatched it from the old man's hand, he did not recollect which,) and struck Joe on the head and knocked him down. He held the stick with both hands and by both forks, raising it up and striking right down before him; Joseph was standing erect within and near to the bars, when

struck, about a yard from the bars; witness did not hear Joseph say a word, nor defendant say any thing about Joe; after the blow, Anna Barker assailed defendant the second time, striking him with her hands, and he struck at her several times with the pitch fork, which John finally took from him; and then Mrs. Barker threw the tomahawk at him. John said to him, "you've knocked Joe in the head," he replied, "no, he's not hurt." The old man told him, (defendant,) to go home, and he went away cursing somebody. Katy Plummer threw a rock at him; defendant in passing through the bars passed close by Joe, but did not seem to notice him; at the time the blow was struck, the old man had hold of Joe by the wrist of the hand which held the rock with both his hands; he stood to one side.

Mr. Barker, the husband of the first witness, testified in relation to a conversation, he heard between his wife and defendant, concerning the quarrel between the negro woman and defendants children, substantially similar to that detailed by his wife. On the day the homicide was committed, witness went to the old man's (Plummers,) and rolled logs with Phil., Joe and John, and finished by breakfast, and every thing seemed friendly between all parties; witness did not remain to breakfast, but went home though he saw his wife and Katy Plummer in the kitchen at the old man's.

Joseph Plummer sr. father of the accused and the deceased, testified: that on Saturday morning, the same day heretofore spoken of, his sons Joseph and Philemon, and his son in law Barker, all of whom lived close by, came to help him roll logs; after getting through, they all went to breakfast, cheerful and in good humor; as they finished breakfast, Anna Barker came in at one door, and defendant went out of the other, whereupon they (the females) said a great deal about his running from them. Witness further declared, that about 2 o'clock in the afternoon, his son Phil. (defendant,) came to the treading yard with two of his children, declaring that he had brought them as witnesses against the negro woman, and wishing him, (witness,) to whip her; witness refused to hear the children make any statement on the subject, but talked a long time with defendant until he seem-

ed entirely pacified and satisfied. He started his children home, and witness presently thereafter saw them coming back, and Anna Barker and Katy Plummer behind them.— Anna came up to Phil. and said she had come to settle the dispute, when def. declared he was ready to settle it any way, so that, he could never hear of it again. John told witness to whip the negro woman for bringing them to make a fuss; witness said nothing. . John then told Phil. (def.) to do so, and Anna Barker came up to him and said "I'll have your hearts blood before you shall whip the negro for your lying children," and attacked him; witness caught hold of her, and endeavored to dissuade her from intermeddling further; Joseph then came forward, with a stone, in his hand held up as if to strike and said, "if you strike her I'll split you down with this stone;" witness was alarmed, saw danger, and throwing down the pitch fork, he had been working with, sprang forward and seized Joe's hand, that held the rock; he jerked and struggled to get rid of witness; the blow struck him over witness' shoulder, from behind; his back being to defendant. The deceased, when struck down, was about six feet within the bars, and he and defendant about five feet apart; witness thought deceased intended not to throw the stone, but to strike with it in his hand, deceased and defendant had always been friendly, but their wives had not been on good terms for a year or two.

John Plummer, brother of deceased and defendant, testified to nearly the same facts with his father; but said that the pitch fork was picked up by Anna Barker, after the old man dropped it, and that defendant caught it by both prongs, wrenched it from her and struck the fatal blow: this witness further testified that the defendant went away from the stack yard crying.

This is all the testimony touching the transaction of the day of the homicide; some testimony was given on both sides relating to the conduct of the defendant subsequently to the homicide; one witness testified, that on Monday morning, after the death, defendant came early in the morning to the house of C. Comegys and requested Mr. Comegys to go with him, saying that his brother Joe was

*JUNE TERM 1840.*

Plummer
vs.
The State.

dead; in this conversation defendant said he had killed his brother on purpose, adding that they had been *deviling* his family for four years, and he expected they would take warning from this and let them alone.   The evidence of another witness, who was present at this same conversation, was, that defendant stated he had gone to whip the negro woman about a difficulty with his children; that his sister Mrs. Barker had attacked him with a hatchet, and his brother Joe with a rock, and that he struck his brother with a pitch fork, and his intent was to knock him down when Mrs. Comegys observed, that it was a pity he had not gone before, he replied, according to this second witness, "yes, they had been deviling his family for a long time, he had been trying to sell out, &c., and he reckoned they would take this for a caution. Mrs. Comegys testified in relation to the same conversation, that she asked defendant, if he did it on purpose, to which he replied yes, but seemed in great distress, cried; his voice smothered; his lips and knees trembled.

The physician who attended on the deceased, deposed that the defendant, called on him about night fall and appeared anxious and distressed, and the witness inferred from his appearance that he had swam Cuiver river; upon his arrival he found Joseph Plummer totally insensible, he examined the wound found the scull was not fractured, possibly there was a fissure but no depression; the symptoms he supposed to have been produced by concussion only, and consequent extravasation of blood; supposed the blow to have been slight, or received obliquely; none but the outward integuments were severed; the flesh wound was quarter of an inch deep, and about one inch and a half long on the left parietal bone, extending from a point perpendicular to the ear forward and downward towards the left corner of the forehead; the physician (witness,) declared, he had often seen boys receive worse looking blows, with no fatal consequences; and was of opinion that with such symptoms of concussion with no predisposition to apoplexy, nine out of ten patients would recover.

On this state of testimony, the court at the instance of the attorney for the state, gave the following instruction: If the

JUNE TERM
1840.

Plummer
vs.
The State

jury believe from the evidence, that the prisoner is guilty of manslaughter only, and not of murder, they may so find under the present indictment; and in that case say what degree of manslaughter, and the punishment.

The defendant, by his counsel, then moved the court to give the following instructions: 1. Under this indictment it is the duty of the jury to decide upon both counts, and whether the accused is gulity, or not guilty of murder in either degree, under either of said counts. 2. And the jury is not bound to consider of the question of manslaughter. 3. If the jury believe in the whole case, that the accused struck the blow under the reasonable apprehension that it was necessary, in order to protect himself from a violent and dangerous assault, they ought to acquit him. 4. If the jury believe from the evidence, that the deceased just before and at the time of, the fatal blow, held a stone in his hand, in position to throw, and threatened to strike the accused, with the stone, they may consider this an assault. 5. If the jury believe from the evidence, that Mrs. Barker and Joseph Plummer, and his wife, came to the place of the affray, with a common object to interfere between Philemon Plummer and the negro woman, and if in pursuance of that common object, only one of the three assaulted and beat P. Plummer, it was in law the assaulting and beating of all three. The court gave all these instructions except the second.

Two questions only are presented to the consideration of this court, by the record: 1st. Is the verdict of the jury in proper form, and second, is that verdict against the evidence or the weight of evidence: First, this court has decided in Watson's case and Mallerson's case, that under an indictment for murder, defendant may be convicted of manslaughter. The grounds of this decision, it is not deemed necessary to review; it is clear, that the provisions of the fourteenth section, of the ninth article, of the act concerning crimes and punishments, cannot be enforced without certain modification and restriction, drawn from the settled rules of practice in the criminal law. If then it be necessary to resort to the common law, to ascertain in what way and to what extent this provision of our statute may be enforced consist-

JUNT TERM
1840.

Plummer
vs.
The State.

ently with established principles of justice, it is not perceived why this court may not resort to the same system, to ascertain the forms by which the provisions of the same code, in relation to homicide, may be enforced. The common law rule, that the allegations and proof must correspond in every material particular, cannot be dispensed with in the application of the 14th section; and whilst by the common law the defendant, in an indictment for murder, could not be convicted of a species of manslaughter entirely dissimilar in character from the murder charged, neither under our statute can this rule be lost sight of; the manslaughter must be contained or included in the indictment, so far as the mode and manner of killing and the instrument with which death is inflicted &c. are concerned, and the defendant must be convicted, if convicted at all, in manner and form as charged in the indictment. The jury, by the common law when they convicted of the manslaughter, negatived the malice aforethought, which constituted the essential ingredient of murder, and under our statute must negative not only the malice, but the lying in wait, and premeditation and deliberation, which have been superadded by our statute, and find the felonious homicide alone, committed in the manner and form charged; the one offence is still presumed to be included in the other, and it is only upon that presumption, that the principle in Mallerson's case, is sustained. The verdict of the jury in this case is exactly in accordance with these principles, and can only be objected to, on the ground that there was no charge of manslaughter in the third degree, as defined by our statute, contained in the indictment, and this objection, I apprehend, resolves itself into the very question which this court has twice decided; there was no error on this point. The question arising on the evidence in this case is one of more difficulty, and the force of the observations of counsel, in relation to the improbability of preserving in a bill of exceptions all the circumstances, which ought and must determine the judgment in the investigation of facts, is most sensibly felt. It is peculiarly applicable to cases, where like the present, it becomes necessary to weigh the credibility of witnesses in

Indictment for murder,—first count charged that defendant "feloniously, wilfully, of his malice aforethought and by lying in wait" assaulted, &c.— second count, laid the manner and form of killing same as first count, but substituted the words "deliberately and premeditatedly," in lieu of the words "by lying in wait." The jury returned a verdict that defendant was not guilty of murder in either degree, in manner & form as charged against him in either count of the indictment,

consequence of conflicting testimony; the manner in which the witness gives his testimony, his looks, his gestures and enunciation give a jury great advantages in estimating the truth of his statements, ours is a tribunal which must decide on the probabilities these statements intrinsically possess. Fortunately for the easy attainment of the truth of this case, no question of malice or intent is involved, and it is not difficult to gather from the statements of all the witnesses, a sufficiently accurate account of the occurrences which took place, at the time of the commission of the homicide. The manslaughter of which the defendant has been convicted, is obviously that described in the tenth section of the act concerning crimes and punishments, that section reads: "The killing of another in the heat of passion without a design to effect death, by a dangerous weapon, in any case, except such wherein the killing of another is justifiable or excusable, shall be deemed manslaughter in the third degree." Justifiable homicide is also defined by the same act; that part which relates to the case presented by the evidence on this record is as follows: "when committed in the lawful defence of such person, when there shall be reasonable cause to apprehend a design to commit a felony, or to do some great personal injury and there shall be imminent danger of such design being accomplished." The design of the thirteenth section above recited, seems to have been to punish that recklessness of human life, which induces men in the heat of passion to resort to dangerous weapons, not in their own defence, but for the punishment of their antagonist.— No intent to kill, and of course no premeditation or malice, is necessary to make out this offence. If a person in the heat of passion resorts to a dangerous weapon and such resort is not necessary to prevent the imminent danger of life, or great bodily harm, the law does not hold the manslayer entirely guiltless. Let us examine the case presented by the testimony on these principles, and for this purpose it will not be necessary to ascertain with certainty the previous declarations of the defendant, or his conduct and declarations subsequent to the commission of the homicide. With this view, I apprehend, that the statements of George Gayle,

Plummer
vs.
The State.

but further found him guilty of manslaughter in the third degree in manner and form as charged against him in the indictment. Held, that both under our statute, and the common law, the defendant may be found guilty of manslaughter, on an indictment for murder, as the former offence is included in the latter. The jury by their verdict negatived the malice aforethought; lying in wait; premeditation, and deliberation, found the felonious homicide alone, committed in the manner and form charged. (see The State vs. Watson 5 r. Mo. R. p. 497

a witness, who was disinterested and disconnected with any of the parties to the affray, is most to be relied upon. The statement of Mrs. Barker the sister of the accused and the deceased, contains some intrinsic inconsistencies, and, upon the whole, seems to be somewhat tinctured with a feeling of ill will to the accused, and must be taken with many grains of allowance, except where it is corroborated by the statements of the witness Gayle; the same observation will to some extent, apply to the testimony of the father and brother of the accused, who without ceasing to mourn the loss of the deceased, may be charitably supposed to retain the feelings of compassion for the prisoner, so natural to persons in their situation. Without undertaking to decide how far the statements of Mrs. Barker may be relied on, in relation to the declarations made by the defendant, about his father and brother and all who would interfere between him and the negro woman, by whom his children had been insulted, it may be assumed, that the defendant went to the stack yard, on the morning of the fatal rencontre, with a view to redress certain supposed grievances, and with the instrument of punishment in his hands. He went in no very calm mood. The testimony of Gayle says, he proposed a fight with his father or brother John, so soon as he arrived, but the evidence of the old man and his son John countenances the idea, that he came proposing to submit his grievances to his father. However this may have been, his father succeeded in calming his passion, and he remained for some time apparently satisfied with the result, though he did not succeed in his avowed object, the chastisement of the female slave. About two hours after defendant arrived, his attention it seems, was arrested by the approach of his sister, Mrs. Barker, and his sister in law the wife of Joseph Plummer; he seemed entirely satisfied of their object in coming, and what had brought them there. He charged that the negro woman had brought them to make a fuss. He attempted to chastise the negro woman, for this impertinent interference, but was prevented by his father. His sister Mrs. Barker, by this time, approached and observed she had come to settle the quarrel, and after some answer from the

defendant, she struck him several times in the face with her hand; defendant caught her hands, and held them in one of his, and raised the hickory switch he had brought for the chastisement of the slave, over his sister; about this time Joseph Pummer appears, and is seen approaching with a stone in his hand, and in a threatning attitude, declaring, according to the testimony of the father, that if his sister was struck he would "split defendant down with a stone," but according to the statement of Gayle saying nothing. The father immediately seized his son Joseph by his hand that held the rock, with both his hands, and whilst Joseph was in this situation, he was struck by the defendant the fatal blow.

That a pitchfork made of hickory, four or five feet long, is a *dangerous weapon,* within the meaning of the statute, I can entertain no doubt. In the hands of an athletic young man, with his antagonist at the distance of a few feet, a more dangerous weapon could not be readily conceived; had the defendant then, at the time he gave the blow, a reasonable apprehension that his life was in danger, or was he in imminent danger of bodily harm? I am constrained to believe that this was not so. To create this reasonable apprehension, there must be a manifest disposition to assault, coupled with a manifest ability to do so; the disposition of Joseph Plummer to assault his brother the defendant, with the stone which he held, may be inferred, from his menacing attitude and his threats. If his threat, however, which was conditional and its execution depended on defendant's striking his sister with the hickory switch, ought to have been so considered, by defendant, there was no good ground that defendant should anticipate an attack, as he could avoid one on such easy, and one would suppose honorable terms. I suppose that even the defendant could not imagine that any dishonor would attach to his retreat from the impotent attacks of a female, and that female his sister. But supposing that the defendant had a right to regard the threats, if any such were made, as conditional and the menacing gestures of his brother Joseph as confirmatory of that idea, had he any just and reasonable grounds to apprehend the *immediate* execution of that threat? His father,

Q

it seems, had hold by both hands of the arm of Joseph Plummer which held the rock, there was no *present ability* on the part of Joseph Plummer, to execute his design, and the want of that ability must have been, or ought to have been, *apparent* to defendant. Can we for a moment suppose, that if the object of defendant had been merely self defence, he could not easily have attained that object by aiding his father in securing and holding his brother Joseph? and was there thing even chivalrous in declining a combat with a brother?

On the contrary, it seems plain that the defendant struck, not with a view to kill, but at least to punish, and as he afterwards observed to give a caution to his brother, for his supposed improper interference in his affairs. That the jury were justified in taking this view of the case, is strongly confirmed by the subsequent declarations of the defendant himself. He no where attempts to justify himself on the ground of self defence, but places his justification on the ground that he did not intend to kill, but aimed to give a *warning* which he thought, would have a wholesome influence. This I apprehend is the very thing against which our statute is directed. This recklessness of a brother's blood, the law regards as contrary to social duty and worthy of punishment. The court instructed the jury, that Mrs. Barker's assault was in legal contemplation, the assault of Joseph Plummer, provided they believed there was a concerted design on the part of both to attack defendant.— But what evidence was there of any such concert? That Joseph Plummer should have followed his sister and his wife to the place where their meddlesome propensities carried them, with a view to their protection and defence, does not not surely argue a preconcerted design against defendant.— The brothers Joseph and Philemon seem to have been on good terms, though their wives had quarrelled; and that a man should be found in company with his wife and sister, and even raising a stone to protect them or punish their assailant, in a quarrel brought on by their own imprudence cannot establish a conspiracy on his part, and the jury have well negatived any such concert and design.

This I imagine is the mildest light in which defendants conduct can be viewed; taking the statement of the witnesses most favorable to his acquittal. If the testimony of Mrs. Barker had been regarded by the jury, they could scarcely have negatived all idea of malice, or intent to kill, as they have done. The instructions given by the court, at the instance of the defendants counsel, were sufficiently clear and explicit to prevent any doubts from arising on the minds of the jury as to the intent and nature of their duties, and the proper marks of the offence which the testimony goes to establish. The verdict of that jury, does not appear from any testimony on this record, to be contrary to the weight of evidence, and the form and substance of the law having been complied with, this court has no power to disturb that verdict. The judgment of the circuit court is therefore affirmed.