THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* BURTON C. WEBSTER, Appellant.

*Indictment for murder — conviction of manslaughter — scope of cross-examination of the defendant — objection to a photograph as evidence — intent — technical errors not regarded on appeal — Code of Criminal Procedure, § 542.*

Where, on a trial for murder, the defendant seeks to justify the homicide on the ground that it was committed in self-defense, in connection with his calling the deceased to account for insults offered to the defendant's wife, and it is admitted that no marriage ceremony had been performed between the defendant and the woman claimed to be his wife prior to the homicide, and it is an open question whether the relation between them was meretricious or rested upon a common-law marriage, it is competent for the prosecution to cross-examine the defendant as to his original relations with the woman.

A photograph is competent evidence, when supported by proper proof as to its accuracy and correctness, and a general objection to its admission as "incompetent, immaterial and irrelevant," not stating any specific ground, is not a good objection, and an exception based thereon is not available on appeal.

The intent with which a homicide is committed may be inferred by the jury from the character of the act.

Where, on the trial of an indictment for murder in the first degree, the evidence for the prosecution would have justified a verdict of guilty of the crime charged, but the jury by rendering a verdict of guilty of manslaughter in the first degree, make it apparent that they accepted the facts as presented by the defendant and his witnesses, according to them full faith and credence and adopting the most favorable view possible upon such facts, technical errors in the admission or exclusion of testimony, or in the comments or criticisms made

by the judge during the trial, cannot be deemed to have affected the substantial rights of the defendant, and hence, by force of section 542 of the Code of Criminal Procedure, are not to be regarded on appeal.

APPEAL by the defendant, Burton C. Webster, from a judgment of conviction, rendered in the Court of Oyer and Terminer in and for the city and county of New York, on the 3d day of October, 1892, upon a verdict finding the defendant guilty of manslaughter in the first degree.

*William F. Howe,* for the appellant.

*Henry B. B. Stapler,* for the respondent.

O'BRIEN, J.:

The indictment charged the defendant with murder in the first degree, in having, on the 2d day of August, 1891, shot and killed one Charles E. Goodwin. The killing was admitted, but, as a defense, the act was claimed to have been justifiable homicide. The issue thus joined, upon evidence presented by the people and the prisoner, was resolved by the verdict of the jury in finding the defendant guilty of the crime of manslaughter in the first degree, and it is from the judgment entered upon such verdict that this appeal is taken.

The deceased was a bachelor, thirty-five years of age, engaged in the wholesale dry-goods business at White street in the city of New York. On the 1st of January, 1891, he took possession under a lease of an apartment consisting of a library or sitting room, bedroom and bathroom, on the third floor of the dwelling known as the Percival apartment house, on West Forty-second street. About May first, the prisoner came to the Percival, bringing with him a woman known as Evelyn Granville, who occupied with him an apartment on the same floor with that of the deceased, the distance from the door of one to the door of the other being about fifty-nine feet.

On the afternoon of August second, which was Sunday, the deceased left his apartment, and in company with his brother and his brother's wife, went to the Grand Central Depot, where the latter took the six o'clock train for the west.

On the part of the people, it is claimed that the testimony showed

FIRST DEPARTMENT, MARCH TERM, 1893.

that the deceased, upon returning to his apartment, took off his coat and hung it on the back of a chair, and then sat down at his writing-desk and commenced the writing of a letter, in the midst of which he was interrupted by a knock at the door, in answer to which he arose and went to the door and opened it, and was confronted by the defendant, who shot him; that he staggered back and stumbled or fell upon and broke a cuspidor, which had been previously broken and mended, which stood immediately behind him when he opened the door, which opened in such a way as to make this position the necessary position to take in opening it. That he fell backwards, and was found by the husband of the housekeeper, who hastened to the apartment immediately upon hearing the noise of his fall, lying outstretched on his back, his feet within three or four feet of the point where he must have stood when he opened the door, and his body occupying the position which it would have occupied had the deceased been shot when opening the door, and had staggered backward, falling over the cuspidor, which was found broken at the feet of deceased, but in its usual place.

This theory, it is claimed, is supported by the facts, that a letter was found lying upon the writing-desk, fully written for three pages and broken off in the middle of an unfinished word; that the pen was found lying on the desk, and the ink bottle open; the pipe half filled with tobacco, and with the ashes still in the pipe lying on the desk; that the direction of the bullet indicated that it was shot from a pistol held directly in front of the abdomen of the deceased, which would have been the necessary position of the defendant had the deceased been shot when he opened the door.

In his dying declaration, the deceased stated to the detective : " I was sitting right at my desk, when a man, I never saw before, by the name of Webster, came and shot me." And to Dr. Wimmer he said : " I was sitting at my desk writing a letter; there was a knock at the door; I got up to answer it, and was confronted by Webster, who shot me. He must have had a grudge against me." To a question by the same witness, as to how the cuspidor was broken, the deceased said it was broken by his stepping on it when falling — stumbling over it.

It further appeared that the prisoner, in escaping from the Percival was met by the janitress and her husband just after the

latter's attention had been attracted by the noise of the heavy fall of the deceased; that he was dressed for the street, and that they did not observe anything about his appearance that would indicate that he was excited; that he looked just as he always looked, and that he remarked to the janitress before leaving, "That man Goodwin is hurt; get a doctor." Thus, without further explanation of his act in shooting the deceased, or attempted justification of the same, he escaped and remained in hiding five days.

The only living witnesses who claimed to have been present at the shooting were the defendant, Evelyn Granville and one Fanny Romaine, a servant on the premises. The defendant testified that the woman known as Evelyn Granville was his wife; that he went to live with her about January 1, 1891, when she had an apartment on the corner of Sixth avenue and Thirty-fifth street, where she was supporting herself by pawning her jewelry, and that he continued to live with her without marriage ceremony having been performed down to the time of the killing of the deceased. That before the first trial of the defendant a marriage ceremony was performed between them at the Tombs. That defendant had been previously married in Illinois to one Charlotte Picard, and ceased to live with her seven months after their marriage.

In his defense, the defendant testified in substance that for some months prior to the shooting, while this woman whom he claimed to have been living with as his wife, by virtue of a civil contract entered into between them without witnesses, was in a delicate condition of health, the deceased frequently made indecent assaults upon her while the defendant was absent and when she was alone and unprotected. That on the day of the shooting, he found his wife lying on the lounge and with her the servant; that his wife complained that she was afraid to cross the hall to her bathroom; that quite often when she went out to go to her bathroom, the deceased would appear at the end of the hall in a semi-nude condition, exhibiting his person to her, and that he was then in the habit of making indecent remarks. He further testified that she told him that one Macfarland had told her that he had seen the deceased at the far end of the hall; that he came there naked at one time, and at another time was there with just his shirt and his pajamas on, and had inquired from Macfarland if the defendant

was in his own room.   What then happened is thus recounted by the defendant:

"We were sitting there laughing and talking, I think about an hour, perhaps more than an hour; a knock came at the door.  I can best describe it as calling it a nervous knock; the chambermaid started to get up; she was fanning my wife, and I told her I would go to the door.  I went to the door and opened it and Goodwin stood before me.  He made some remark, 'It is you, is it?' or 'Damn it, it is you,' and struck at me, and I think he grazed my nose; I stepped back slightly; he went from the hall in the direction of his room and I followed him, and when I got to his door I might have been slightly in his room, slightly outside; I might have been upon the threshold; I cannot state.  When I got there he was confronting me.  I told him, I said, 'Goodwin, this thing has got to stop.'  He had been hounding me and my wife for a long time.  She had never encouraged him in any way.  She had done nothing at all to warrant him in persecuting her.  I complained to the landlord of him.  I could not leave there because I had a lease.  He stood there in front of me; he raised his cuspidor over his head.  I heard a voice behind me, my wife's voice, 'Look out, Burt!  Look out, Burt; he will kill you.'  At the time he had this held so (illustrating), and impulsively, knowing that I was armed, drew my pistol and shot him.   *   *   *   *   "

"By THE COURT:

"Q. State what you did after you fired the shot?   A. I hardly realized what had happened at the moment.   When I next looked at Goodwin he was on the floor.   I told him I was sorry it happened, but he brought the whole thing on himself; that I had done nothing to him; I had never sought him; he had been the aggressor from the beginning to the end.   I told him I would go at once and get him a doctor, and send him assistance.   I went from there to my room, put on my coat, and went downstairs; there were three parties in the hall at the time, I think; I spoke to one of them and told him to go at once for a doctor for Goodwin; that he was hurt."

In this testimony defendant was corroborated by the evidence of the two women Evelyn Granville and Fanny Romaine, who claim to have been eye-witnesses of the shooting.

Appellant insists that, notwithstanding the conflict in the testimony, that taking it in its entirety, it shows that the jury must have disregarded the evidence in arriving at their verdict, and must have entirely ignored the testimony showing that the defendant acted in self-defense.

We cannot assent to this view, because, if the jury had credited the evidence presented by the people and the inferences which could have been justly drawn therefrom, they might well have found the defendant guilty of the crime of murder in the first degree. How far the people's evidence was destroyed or impaired by that presented by the defendant we shall have occasion to speak of when we have disposed of the exceptions which appellant insists present legal errors committed on the trial which would require a reversal of the judgment, irrespective of the question of the verdict being against the weight of evidence.

The exceptions taken in the cross-examination of the defendant as a witness in his own behalf, with respect to his relations and conduct with Evelyn Granville prior to her marriage, were certainly within the discretion of the trial judge, in view of the claim made that in resenting the insults offered to his wife he was justified in calling the deceased to account, and that the encounter with the deceased which resulted, and which placed defendant in apprehended danger of great bodily harm from the cuspidor in the hands of the deceased, justified the shooting as an act of self-defense.

Throughout the trial the prisoner placed great stress on establishing that the relation between him and Evelyn Granville was that of husband and wife; and it was, therefore, competent on the part of the people to show what in the beginning was the relation between these parties, in view of the admitted fact that no marriage ceremony had ever been performed between them prior to the shooting; and as the question was an open one whether or not it was a common-law marriage or a meretricious relation, the cross-examination of the defendant as to whether such relation was marital or meretricious was entirely proper.

Another exception relied upon relates to the introduction of a photograph. The record shows that the defendant was handed the photograph and was asked: "Q. Is that a just picture of the man you met there? A. That somewhat resembles him." The photo-

graph was then offered in evidence and was objected to as "incompetent, immaterial and irrelevant."

It cannot be seriously claimed that photographs are not admissible, because the rule permitting such evidence is founded upon the same principle that applies to diagrams or maps, which, upon proper proof as to their accuracy and correctness, are competent. The objection made, therefore, that it was incompetent, immaterial and irrelevant, was not a good objection. As said in *Murphy* v. *People* (63 N. Y. 595): "The objection was general, and no ground of objection was specified. If objection had been taken to the mode of proving the facts, other proof might have been given, and the objection have been obviated. In the absence of an objection of this kind, it must be assumed that the question intended to be raised by the objection made was as to the competency of proof of the fact to which the question related, and not to the mode of proving it. * * * The authorities on the general proposition that the objection now taken should have been specifically made on the trial, in order to be available on error, are decisive."

Other errors assigned are directed to propositions of law in the charge of the learned trial judge. Considered as a whole, we think the charge was a fair and impartial presentation of the facts bearing upon the claims of the prosecution, the defense presented by the prisoner, and the law relating to the different degrees of murder and manslaughter. The exceptions were few and will be briefly referred to.

The first was taken to the rule of law laid down by the judge as to the weight to be given to evidence of good character. Any error into which the court in its charge may have fallen in this respect was entirely cured, when its attention was called to it, by charging the very request asked for by the defendant's counsel.

The court, in response to an inquiry from the jury upon the question of intent, said:

"You must find a design to kill. It is only proper I should state to you that that design to kill may be found from all of the surrounding circumstances. A man is presumed to intend or design what his act is liable to perform. If a person fires a pistol into the body of another, from that fact alone the jury may find the intent.

You must find the intent, the design to kill, but it is not necessary that a person killing another should announce beforehand he does intend to kill. In order for you to find that intent you must be satisfied from all the surrounding circumstances. The act itself, the way it was committed, the weapon that is used, furnish the design or intent to kill, to find murder in the second degree."

MR. HOWE.— "Will your honor permit me to except to that portion of your charge, and I ask you now to charge the jury in response to their question, that if they have any reasonable doubt of intent to kill, they should not convict of murder in any degree."

THE COURT.— "I so charge, and repeat, as I have already said to you, you can find that intent from the nature of the weapon and the manner of its use."

The exception to this we do not regard as well taken ; for all the text-writers, supported by the decisions of our Court of Appeals, hold to the view that the intent could be inferred from the character of the act. Thus Bishop :

"It is a rule of criminal evidence that a man is presumed to intend the natural, necessary and even probable consequences of what he intentionally does." (1 Bishop on Criminal Law [7th ed.], § 734. See, also, Starkie on Evidence [10th ed.], 848 ; 1 Phillips on Evidence, 632 ; *People* v. *Conroy*, 97 N. Y. 77 ; *Foster* v. *People*, 50 id. 609.)

It will thus be seen that the exceptions taken to the charge of the court were untenable, and the two propositions requested by the defendant were charged.

Certain exceptions taken upon the cross-examination of a witness for defendant, Fanny Romaine, as to her intimacy with Mrs. Webster and her opium habits, we do not regard as good, because it was competent upon the question of bias of the witness to show her exact relation with the defendant's wife, and the fact as to whether or not she was under the influence of opium would effect to some degree the weight to be attached to her statement of what occurred at the time of the shooting. It was a matter within the discretion of the judge, and we do not think that in this instance it was abused.

The most serious exceptions presented by this record are those having reference to criticisms made during the progress of the trial when the learned justice was passing upon the admissibility of the

evidence, and the introduction over defendant's objection of evidence to prove what the servant Fanny Romaine had told a witness with respect to going to Koster & Bial's, and to contradict Fanny Romaine's testimony as to the extent of her habits in taking opium.

We think it clear that these matters upon which the witness Romaine was cross-examined were collateral matters, and that, under the rule, by her answers given upon cross-examination the people were bound, as said in *Stokes* v. *People* (53 N. Y. 176): " Upon cross-examination the prosecution had the right, for the purpose of impairing the credit of the witnesses, to ask questions as to those collataral matters, but having asked and obtained answers, must abide by the answers given; other witnesses could not be called to prove such answers untrue."

In *People* v. *Ware* (29 Hun, 473 ; affirmed, 92 N. Y. 653) it said : " The rule upon this subject has frequently been made a matter of consideration by the courts, and it is now well established that to entitle the party interrogating the witness in this manner, by way of cross-examination, to introduce evidence to contradict his statements, the cross-examination must be directed to a material inquiry in the case or to evidence establishing a hostile or unfriendly bias against the party in the mind of the witness." (See, also, *Kirkpatrick* v. *N. Y. C. & H. R. R. R. Co.*, 79 N. Y. 243 ; *Chapman* v. *Brooks*, 31 id. 87 ; *Carpenter* v. *Ward*, 30 id. 243.)

We think this rule was violated by admitting this evidence to contradict Fanny Romaine on collateral matters, involving as it did the questions whether she had or had not, weeks prior to the shooting, slept in Mrs. Webster's apartment, and whether she had not while she lived at the Percival been in the habit of taking opium, and had not told Mrs. Wade that if she was deprived of opium it would kill her. The question, however, to be determined is, whether this was a prejudicial error. The Criminal Code requires (§ 542) that, " after hearing the appeal, the court must give judgment, without regard to technical errors or defects, or to exceptions which do not affect the substantial rights of the parties."

The witness Romaine had testified to the taking of opium ; she had admitted her intimacy with Mrs. Webster ; and under these circumstances, we do not think any serious prejudice resulted to defend-

ant in the eyes of the jury, who were aware, before such testimony, of the fact that the witness Romaine was in the habit of taking opium during all the time that she had been in the Percival flats, and had been intimate with Mrs. Webster. The additional circumstance about Koster & Bial's is not serious enough to justify a reversal of the judgment.

With respect to the comments or criticisms of the learned justice, which it is claimed were made during the entire trial, including the charge, while there was some slight justification growing out of the necessity of explaining the reasons for his rulings, we think they were carried to too great an extent; and what was said in the case of *Sindram* v. *People* (88 N. Y. 202), in speaking of comments made upon testimony in the charge of the judge, is pertinent here : " It is desirable that the court should refrain, as far as possible, from saying anything to the jury which may influence them either way in passing upon controverted questions of fact, and perhaps comments on the evidence might be carried so far as to afford ground for assigning error."

The reason assigned by the judge himself, that these comments and criticisms were required to explain his rulings, coupled as it was during the various stages of the case by the emphatic statement of the court that the jury were the judges of the controverted facts, and that the opinion of the court was in no way to affect them, we think destroyed any impression which otherwise such comments might have created in the minds of the jury adversely to the prisoner ; and our conclusion is that, having in view the rule laid down for our guidance by the Code of Civil Procedure, we should not resort to what may be a technical error for the purpose of reversing a judgment which upon the whole case does not seem to do any injustice to the defendant.

Upon the entire record, we think it apparent, whatever technical error in the admission or exclusion of testimony may appear, or in the comments or criticisms made by the judge during the trial, that it cannot be contended that such could have been injurious to the rights of the defendant, in view of the fact that the jury by their verdict accepted the facts as presented by the defendant and his witnesses, according to them full faith and credence, and adopting the most favorable view possible upon such facts.

If we give little or no weight to the People's case — which, as we have already said, would have justified a verdict of murder in the first degree — and consider the testimony offered by the defendant, it is fairly susceptible of but one conclusion, and that consistent with the verdict, holding the defendant guilty of at least manslaughter in the first degree.

The Penal Code (§ 179) defines homicide as " the killing of one human being by the act, procurement or omission of another." " Such homicide is manslaughter in the first degree, when committed without a design to effect death, either (1)  *  *  *  (2) in the heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon " (§ 189).

At the time of the killing, the defendant was within his own apartment, within the precincts of his own home, where he had a right to be, in an attitude of defense, which he had a right there to assume against the onset of defendant, a trespasser therein.   And this circumstance alone is most potent in determining the question as to which one was the aggressor, and as to whether or not the shooting was without justification or excuse.   As said by the learned trial judge in his charge : " Presuming that you believe Webster's story, Goodwin after he struck the blow, wanted to get away ; he did not stay there to continue the fight, dispute or whatever there was, if there was any, but he left and retreated to his own room.   It is perfectly evident that Webster was perfectly safe if he stayed where he was, if he had wished not to take the law into his own hands.   If any crime had been committed he could have gone to the police magistrate and called in the police.   He, however, did not stay where he was, but followed Goodwin.   He followed Goodwin to his own room.   Goodwin went into his own room, and defendant followed him to the doorway.   So far as it appears, Goodwin was unarmed, and being in his own room, he was justified in using force to prevent any assailant from coming to his room and assaulting him there.   Webster was armed with a pistol.

" Gentlemen, I leave it to you to say who was the assailant and who was acting in self-defense.   Goodwin, with nothing but a cuspidor in his hand, Webster following him into his room with a pistol in his pocket.   I leave it to you to say from that story, as told by Webster himself, whether Webster was justified in taking out his

pistol from his pocket and killing Goodwin without attempting to get around the door, the side of the door, without retreating, without saying, ' Stop, or I will fire ; ' without giving him warning — was what he did necessary to protect his life or person from serious injury ? If you believe that it was, if you believe it was self-defense, that he was justified under this statute, as I have stated, then it is your duty to say by your verdict that Webster did no wrong when he shot and killed Goodwin, and he should go forth a free man."

That this view as to the obligation resting upon the defendant to avoid the necessity of taking human life was thus correctly presented to the jury, is shown when we consider the cases referring to this subject. *Shorter* v. *People* (2 N. Y. 193), which has been frequently referred to and cited with approval, holds (head-note) : " One who is without fault himself, when attacked by another, may kill his assailant, if the circumstances be such as to furnish reasonable ground for apprehending a design to take away his life or to do him some great bodily harm, and there is also reasonable ground for believing the danger imminent that such design will be accomplished, although it may afterwards turn out that the appearances were false and there was in fact no such design nor any danger that it would be accomplished. But this principle will not justify one in returning blows with a dangerous weapon when he is struck with the naked hand and there is no reason to apprehend a design to do him great bodily harm. Nor will it justify homicide when the combat can be avoided, or where, after it is commenced, the party can withdraw from it in safety before he kills his adversary."

And in *People* v. *Sullivan* (7 N. Y. 396), is is said (head-note) : " Where one believes himself about to be attacked by another and to receive great bodily injury, it is his duty to avoid the attack if in his power to do so, and the right of attack for the purpose of defense does not arise until he has done everything in his power to avoid its necessity."

Section 205 of the Penal Code defines justifiable homicide, so far as applicable to the case at bar, as follows : " Homicide is also justifiable when committed, either 1. In the lawful defense of the slayer * * * when there is reasonable ground to apprehend a design on the part of the person slain * * * to do some great per

sonal injury to the slayer * * * and there is imminent danger of such design being accomplished. * * * "

In finding the defendant guilty of manslaughter in the first degree, the jury took the view of the evidence most favorable to defendant. They accepted his story and that of his two witnesses, as to his anger being aroused by the complaints of Evelyn Granville, by the immediate presence thereafter of the deceased at his door in pursuit of her, by the blow in the face then alleged to have been received, and that on following the deceased for the purpose of remonstrating, he was greeted, as alleged, by a curse from the deceased, who stood with a cuspidor in his hands — which, though insufficient to justify defendant in entertaining apprehension of great bodily harm, might be regarded as the first step in an affray invited by a man who had insulted a woman under his protection — and that, thus heated with passion, he drew his revolver and, with no intent to kill, fired at the deceased.

The testimony shows that the deceased was the pursued, and not the pursuer ; that he had retreated into a place where he had a right to defend himself against the further pursuit of the defendant ; that when the defendant stepped upon the threshold of the abode of the deceased, the latter was standing six feet away with a raised cuspidor, which the jury had a right to assume was an attitude of defense against an expected attack from his pursuer. Even though the deceased had intended to throw the cuspidor, this could have been avoided by stepping one side or leaving the room. But instead of this, and without making any effort to avoid the attack, though in his power to do so, the defendant took from his pocket a pistol, which, without warning or intimation, he fired into the abdomen of the deceased, in whose hands the cuspidor remained still unthrown. We agree with the counsel for the people, that the evidence presented by the defendant was not sufficient to show that the shooting was done in self-defense, or in reasonable apprehension of bodily harm which could not be avoided ; and that it was only by taking the most favorable inference from the testimony of defendant's own witnesses, that the jury reached the conclusion that the defendant was not guilty of murder in the first degree, but was guilty only of manslaughter. Had the defendant been convicted of murder in either degree, there would be greater force in the

argument made that the errors pointed out were prejudicial to defendant.

It is this conclusion that the verdict was just, and the conviction that is forced upon us from a reading of the evidence, that the defendant should not entirely escape the consequences of what it is apparent was a wanton and deliberate killing of a fellow man, that induces us to disregard, as we are required to do, the technical errors which may appear in the record, it being apparent, upon the testimony here produced, and from the character of the verdict, that such errors did not affect the substantial rights of the defendant.

We are, therefore, of opinion, in accordance with the section of the Criminal Code to which we have already referred, which requires that we should give judgment without regard to technical errors or defects, or to exceptions which do not affect the substantial rights of the parties, that the judgment should be affirmed.

Vᴀɴ Bʀᴜɴᴛ, P. J., and Foʟʟᴇᴛᴛ, J., concurred.

Judgment affirmed.