## THE STATE v. JAMES A. COLVIN, Appellant.

### Division Two, March 15, 1910.

1. **MURDER: Conviction of Manslaughter: Instruction.** Where a defendant has been convicted of manslaughter in the second degree, he cannot complain of the giving of an instruction on murder in the second degree.

2. **INDICTMENT FOR MURDER: Sufficient to Charge Manslaughter.** An indictment for murder in the second degree will support a verdict convicting defendant of manslaughter in the second degree under Sec. 1826, R. S. 1899. Where the indictment for murder charges the homicide to have been committed by violence it embraces manslaughter in the second degree as defined by that statute.

3. **MANSLAUGHTER IN SECOND DEGREE: Instruction: Omitting in Directing Part Elements of Offense.** An instruction which defines manslaughter in the second degree in the exact language of the statute (Sec. 1826, R. S. 1899), but which, from the subsequent part submitting to the jury the facts they must find and believe, omits the words "without a design to effect death" and "in a heat of passion," is erroneous. Since the statute defines manslaughter in the second degree to be "the killing of a human being, without a design to effect death, in a heat of passion, but in a cruel or unusual manner," etc., these words name an essential element of the offense.

4. **———: ———: ———: Heat of Passion: Cured by Another Instruction.** Nor is the error in omitting from the directing part of the instruction for manslaughter in the second degree the essential words "in a heat of passion" cured by another instruction asked by defendant which correctly defined those words. It is not a question of a correct definition of the words, but the question is, Did the instruction given designate the elements necessary to constitute manslaughter in the second degree as definite by the statute?

5. **———: ———: ———: Without Design to Effect Death: Favor to Defendant.** Defendant is not precluded from complaining that the instruction designating the constituent elements of manslaughter in the second degree, of which he was convicted, omitted the necessary words, "without a design to effect death," on the theory that their omission was a benefit to him. The essence of manslaughter in the second degree as defined by Sec. 1826, R. S. 1899, is that the killing was not intentional; and the jury could not find defendant guilty without also finding that the killing was not intentional.

6. ———: ———: **In Cruel or Unusual Manner.** Since the statute, in defining manslaughter in the second degree, uses the words "in a cruel or unusual manner," an instruction which requires the jury to find the killing was done "in a cruel and unusual manner" is faulty. But it is an error of which defendant cannot complain, for it required the State to show more than the statute requires. Proof of either alternative meets all the requirements of the statute.

7. ———: ———: ———: **Defining Words.** An instruction for manslaughter in the second degree under Sec. 1826, R. S. 1899, which says that "the killing of a human being, without a design to effect death, in a heat of passion, but in a cruel or unusual manner," etc., is not erroneous because it does not define the words "in a cruel or unusual manner." The question as to what is a cruel or unusual manner should be left to the jury.

8. **DYING DECLARATIONS: Admissibility.** Defendant and his neighbor got in a quarrel over a division hedge fence, and defendant struck the neighbor with his fist, on the side of the head, and over the eye. A week later he died. On the fifth day after the fight, his fever rose to 102 degrees, he was at times unconscious, and his doctors came and gave him strong medicines. That evening his neighbor came and wrote his will and finished it about nine o'clock, and when he arose to go he bade deceased good-bye, and expressed the wish that he would soon be better, to which deceased replied, "The next time you hear from me they will be hauling me to my grave." As the writer of the will started out and had reached the door, the deceased called him back and stated he wished to ask his advice as to whether he had better commence suit against defendant now or wait until he was dead and let the State prosecute him. The witness stated to him that he did not feel competent to advise him, as he had never heard his side of the trouble, and thereupon deceased said, "I will tell you how it was," and proceeded to detail the statement of the difficulty which was admitted as a dying declaration. The wife of deceased testified that he said to the writer of the will: "He thought the next time he heard from him he would be hauling him to his grave—that he wouldn't get well—didn't have any hopes of his ever getting well." After making this statement deceased gradually sank into unconsciousness, and died two days later. *Held*, that the statement was made under a sense of impending death, and was properly admitted as a dying declaration.

9. **HEARSAY: Elicited by Defendant.** Where defendant has asked for a part of a conversation a witness had with deceased after the difficulty, the State is entitled to the whole of it.

10. ———: **No Objection: Incompetent.** A mere objection to the witness testifying to what deceased said to him about the difficulty that it was incompetent, amounts to no objection at all.

11. ———: **Cumulative.** Testimony of a witness who recites a statement made to him by the deceased, which is not a dying declaration and in which he states the details of the fight, if merely cumulative of the dying declaration subsequently made, and more favorable to defendant than that declaration, is not prejudicial.

12. **TURBULENCE: Specific Incidents.** It is not proper to permit a witness to testify what was deceased's "disposition as to being high tempered, abusive and turbulent." The inquiry should be restricted to his general reputation in that regard.

Appeal from Clark Circuit Court.—*Hon. Chas. D. Stewart*, Judge.

REVERSED AND REMANDED.

*N. M. Pettingill, Whiteside & Rutherford* and *Perry S. Rader* for appellant.

(1) It was error to permit Mrs. Murphy, wife of deceased, to detail a statement made by Murphy as to the facts of the difficulty between him and the defendant. Her testimony of what Murphy said was hearsay, and could have been admissible only on the theory that Murphy's statement was his dying declaration. It was not a dying declaration, and her testimony was not competent on any theory. State v. Johnson, 118 Mo. 491; State v. Craig, 190 Mo. 338; State v. Brown, 188 Mo. 460; State v. Hendricks, 172 Mo. 671; State v. Garth, 164 Mo. 562; State v. Stephens, 96 Mo. 637; State v. Chambers, 87 Mo. 406; State v. Mathes, 90 Mo. 571; State v. Simon, 50 Mo. 375. The wrongful admission of this testimony opened the way to the most hurtful occurrence of the entire trial. It opened the way to call out of Mrs. Murphy the statement that defendant had irons in his hands when he struck Murphy. In that statement is to be found an explanation of the verdict in this case. When the court

came to instruct the jury it gave instruction 14 asked
by defendant, that "all testimony, statements or ref-
erences to knucks or irons are excluded from the con-
sideration of the jury;" and we frankly admit the court
did what it could after it discovered its error in ad-
mitting this testimony, to correct the error. But that
did not cure the damage done. It has often been held
by this court in criminal cases that the admission of im-
proper testimony will not be cured by an instruction
for its exclusion. State v. Minor, 193 Mo. 613; State
v. Bateman, 198 Mo. 222; State v. Thomas, 99 Mo.
257; State v. Fredericks, 85 Mo. 150; State v. Schnei-
der, 35 Mo. 533; State v. Marshall, 36 Mo. 400; State
v. Hopper, 71 Mo. 425; State v. Mix, 15 Mo. 153; State
v. Daubert, 42 Mo. 242. This testimony did not inci-
dentally slip into the case. It was not one of those
incidents that may occur in any trial where a witness
may unexpectedly testify to an improper thing which
neither court nor counsel can anticipate. It was skill-
fully drawn out by counsel, again and again, and sev-
eral times after it had been ruled out by the court. This
case had been tried before. The information did not
charge the use of any deadly weapon or weapon of
any kind; on the contrary, it charged that defendant
made an assault "with his fists." And yet after Mrs.
Murphy had closed her recital of what Mr. Murphy
said about the *res gestae,* the State's attorney asked of
her the very question that called forth her statement
about an iron in defendant's hand. That statement
and similar statements by four other witnesses account
for the verdict in this case; and whether or not de-
fendant should be awarded a new trial on the sole
ground that this damaging testimony was permitted to
go to the jury at all, though after a time ruled out
by the court, it is a fact that, had the court excluded
Mr. Murphy's statement as incompetent as a dying
declaration, this damaging statement about irons would

never have reached the jury; and therefore it should be held in view by the court in determining the question whether the admission of any part of this so-called dying declaration was error.  It is for the court to determine the admissibility of an alleged dying declaration before it is permitted to go to the jury. State v. Sexton, 147 Mo. 90; State v. Simon, 50 Mo. 375; State v. Zorn, 202 Mo. 12.  (2) The court erred in permitting John Weaver to detail what Murphy said about the fight.  Murphy's statement was not competent as a dying declaration.  It should be further noted that this witness didn't understand all that Murphy said, and therefore he was not competent to testify to any part of Murphy's statement.  State v. Johnson, 118 Mo. 491.  (3) The court erred in permitting John Chasteen to testify as to what Murphy said about the fight.  Murphy's statement was not competent as a dying declaration.  (4) The court erred in permitting Jasper Kirner, over the objection and exception of defendant, to detail to the jury a statement by Murphy as to how the difficulty occurred.  If this testimony is competent, then any witness can testify any and every statement made to him by a deceased at any time prior to his death.  (5) The court erred in refusing to permit defendant to show what was Murphy's disposition as to being high-tempered, abusive and turbulent.  The competency of such testimony has been established by a long line of cases in this State. State v. Hicks, 27 Mo. 588; State v. Keene, 50 Mo. 357; State v. Bryant, 55 Mo. 75; State v. Feeley, 194 Mo. 300. (6) The court erred in giving instructions on the subject of murder in the second degree.  The numerous and elaborate instructions on that subject led the jury to believe that in the mind of the court the defendant was guilty of murder in the second degree.  The court thereby prejudiced defendant's rights in the estimation of the jury, and the result was to deny him a fair trial.  There was no evidence upon which a verdict

for murder in the second degree could have been based. It seems to us impossible to read the testimony of these witnesses and discover any premeditation in the case. There is none from which it can be inferred. Where there is no evidence to authorize an instruction on a particular grade of the offense, no instruction on that grade should be given. State v. Feeley, 194 Mo. 300. Instructions should always be framed with reference to the facts in evidence. Hardister v. Supreme Order, 118 Mo. App. 679. It is for the court to determine what grade or grades of homicide the evidence tends to establish, and it is its duty in instructing the jury to confine itself to such grade or grades. State v. Ellis, 74 Mo. 220; State v. Johnson, 76 Mo. 127; State v. Robinson, 73 Mo. 306. (7) Instruction 5, given for the State, is reversible error. It was the only instruction on manslaughter in the second degree given. a. There was absolutely no evidence that defendant beat Joseph Murphy· upon the head, face and body "in a cruel and unusual manner." All the evidence shows that he simply hit him with his fist, and that he hit him only after Murphy had struck him or was trying to strike him with his whip. There was nothing cruel or unusual about that. The fact that he walked home, that the doctor on that day said he did not consider his case serious, that he continued to get better until the doctor began to "freely crowd" strychnine, digitalis and cactus into him, shows that he was not hit in a cruel and unusual manner. In State v. Wilson, 98 Mo. 447, Judge BRACE used these words: "In a sense every killing may be said to be cruel, and killings may be said to be unusual, but surely it was not in this sense the Legislature used the terms, for, if so, they add no meaning to the section. It is not difficult to conceive the idea of a killing in the heat of passion that would be cruel or unusual, but within it would never be embraced the instance of one who in a heat of passion in the course of an angry altercation struck

a single fatal blow with an ordinary working imple-
ment which he had in his hand at the commencement
and during the entire progress of the altercation.'' If
the striking of deceased in that case with a hoe could
not be said to be a killing of a human being ''in a cruel
and unusual manner,'' how can it be said that the
striking of Murphy by defendant with his fist was a
killing ''in a cruel and unusual manner?'' In fact, is
not the striking of another with one's fist almost the
least cruel manner by which one person can kill an-
other? And is it not almost absurd to say the Legisla-
ture by using the word ''unusual'' had in mind the
striking of another with one's fist? It should not be
overlooked that five of the State's witnesses were per-
mitted to testify that Murphy said defendant used
iron knucks in striking him. That evidence ought not
to have been admitted at all. With it before the jury
they could well have found that defendant struck Mur-
phy in a cruel and unusual manner. If it had not gone
to the jury, it is impossible to conceive that they could
have found, under the rest of the evidence, that de-
fendant struck Murphy in a cruel and unusual manner.
We contend that there was no evidence that shows de-
fendant struck deceased in a cruel and unusual man-
ner, and that it was error to give this instruction 5
for the State. b. It is also erroneous because it omits
the words ''in a heat of passion'' required by the stat-
ute. R. S. 1899, sec. 1826; State v. Strong, 153 Mo. 555;
State v. Reed, 154 Mo. 122. c. The instruction is also
erroneous because it omits the words ''without a design
to effect death,'' required by the statute. Without
such design there can be no manslaughter in the sec-
ond degree. R. S. 1899, sec. 1826. The very essence
of manslaughter in the second degree is that it must
be ''without design to effect death''—that is, the de-
fendant must not have intended to kill deceased. It is
what at common law was known as involuntary homi-
cide. This statute, it has been held, does not apply to

intentional killing.  State v. Edwards, 70 Mo. 482;
State v. Curtis, 70 Mo. 600; State v. Gassert, 65 Mo.
352; State v. Wilson, 98 Mo. 447.  In 21 Cyc. Law &
Prac., p. 1071, it is said "the jury should be instructed
as to the essential elements of manslaughter."  d. The
court erred in not defining the words, "excusable or
justifiable homicide" used in this instruction numbered
five.  State v. Jacobs, 152 Mo. 565.  (8) The indict-
ment does not authorize an instruction under section
1826.  An indictment for murder in the second degree,
a necessary part of which is premeditation, wilfulness
and malice aforethought, does not charge that the
killing was done "without a design to effect death."
If it charges, as the indictment in this case does, that
the striking was done with the fist, it does not charge
that it was done "in a cruel and unusual manner." If
it charges, as the indictment in this case does, that de-
fendant "wilfully . . . did kill and murder" it
cannot charge the killing was "without a design to ef-
fect death."  The indictment will not support a verdict
under section 1826, nor an instruction based on that
section.  (9) The court erred in giving the State's in-
struction number. 14.  It is a mere abstract proposition
of law.  There is no effort to apply it to the facts in
the case.

*Elliott W. Major,* Attorney-General, and *John M.
Atkinson,* Assistant Attorney-General, for the State.

(1)  Appellant's first contention is that the trial
court committed error in permitting Mrs. Murphy, the
wife of deceased, to detail in her testimony as a dying
declaration, a statement made by deceased, giving the
facts of the difficulty, and how it occurred.  State v.
Brown, 188 Mo. 460; State v. Kelleher, 201 Mo. 637;
State v. Craig, 190 Mo. 338; State v. Nocton, 121 Mo.
549; State v. Elkins, 101 Mo. 350.  The proof in this
case shows that deceased made the statement after
he had abandoned all hope of recovery and was under

the belief of immediate impending dissolution. At that time his friend and neighbor, Chasteen, came at a late hour on a wintery night, and wrote his will, and after the will had been written, he said to Chasteen: "The next time you hear of me I will be on the road to my grave." The very fact that deceased asked whether a criminal suit should then be started, or whether it should await his death, clearly demonstrates that he had abandoned all hope of recovery, and felt that he was near death's door. He became unconscious on the following morning, Wednesday, and died Thursday. Under this assignment of error counsel for appellant has made a most ingenious argument, because certain witnesses, in detailing the dying declaration, mentioned the fact that deceased thought appellant struck him with knucks. The court excluded from the jury all testimony as to the use of knucks by appellant, if any knucks were used, and even went so far as to give the written instruction, No. 14, directing the jury to disregard all references to knucks. If any error was committed by the witnesses' mentioning the knucks, surely the ruling of the court and the written instruction should, and did, remove such error. The dying declaration was properly admitted in evidence, and the excluding of all testimony in reference to knucks, makes this assignment of error without merit. (2) Appellant assigns error in permitting the witness Jasper Kirner, to testify to a certain statement made by deceased to him on either Monday or Tuesday, prior to the death of deceased, as to how the altercation came about. This assignment is without merit, for the following reasons: First—Appellant on cross-examination brought out a part of the conversation between this witness and deceased, and the State was then entitled to the full conversation. Second—The objections are so vague and indefinite, giving no reason for their assignment, as to amount to no objections at all. The first objection is in this form: "Objected to by de-

fendant's counsel because incompetent." Third—Appellant, after the above testimony was given, much of which was favorable to appellant, specifically waived any objection to such testimony, except that referring to the use of knucks. The objection after this conversation was given, is as follows: "Objected to by defendant's counsel—as to the knucks." The court ruled, "The objection sustained." All of the objections made to the introduction of this testimony complained of are too indefinite and uncertain, give no reasons, and amount to no objections at all. State v. Wilson, 223 Mo. 156. Fourth—Further, the testimony detailed by this witness was not prejudicial to appellant. It was practically the same evidence as detailed by the witnesses in giving the dying declaration, with the exception that it was more favorable to the appellant. The dying declaration was legally admitted and this evidence would only be cumulative of the dying declaration, with the friendly feature in favor of the appellant. (3) Appellant assigns error because the court instructed on murder in the second degree. This assignment is without merit for two reasons. First—Appellant having been convicted of manslaughter in the second degree, a crime lower in degree and punishment than murder in the second degree, is in no position now to be heard to complain because the court instructed on murder in the second degree. R. S. 1899, sec. 2535; State v. Feeley, 194 Mo. 323; State v. Todd, 194 Mo. 395; State v. Edwards, 203 Mo. 543; State v. Billings, 140 Mo. 205; State v. Nelson, 88 Mo. 126; State v. McMullin, 170 Mo. 631. Second—The evidence fully warranted the court in submitting this cause to the jury by proper instructions, as it did, on murder in the second degree. (4) It is contended by appellant that the court erred in giving instruction 5 on the part of the State. In the first part of this instruction the statutory definition of manslaughter in the second degree is fully and correctly given. In

what is designated as the "directing" part of this instruction, the phrases "in a heat of passion" and "without a design to effect death," are both omitted. The instruction should be read as a whole. So read, it correctly defines manslaughter in the second degree. The phrase "heat of passion" is correctly defined in instruction 15, given at the request of appellant, and appellant cannot now be heard to complain because instruction 5 did not define this same phrase. Instruction 5 went further than it should have gone and required the jury to find that the wounding of deceased was both "cruel and unusual," while the statute only requires it to be "cruel or unusual." If this was error, it was error in favor of appellant, and he cannot now be heard to complain. Omitting from the so-called directing part of said instruction 5, the phrase "without a design to effect death," was, if error, in favor of appellant and he cannot now be heard to complain. In the argument in this cause, counsel for appellant admitted that instruction 5 went further and required the jury to find all of the elements of murder in the second degree before the jury was authorized to convict appellant of manslaughter in the second degree. If this statement be true, which we do not controvert, then the error was all in favor of appellant, and he cannot now be heard to complain. State v. Pohl, 170 Mo. 428; R. S. 1899, sec. 2535. Section 1826, R. S. 1899, only requires the killing to be "in a cruel or unusual manner." This statute should not be read "cruel and unusual" manner. Commonwealth v. Wyatt, 6 Rand (Va.) 694. The term "in a cruel or unusual manner," as used in this statute, should be given its ordinary meaning as understood by the Legislature which enacted the same into a law. The parties and circumstances to the killing as well as the manner of the killing should always be considered in each case to properly apply this statute. State v. Jennings, 134 Mo. 277; State v. Wilson, 98 Mo. 440; State v. Kloss, 117

Mo. 591. (5) Appellant makes the further assignment of error that under an indictment for murder in the second degree, as in this case, the court was not authorized, at all, to submit the case to the jury by instruction on manslaughter in the second degree, as defined in section 1826, R. S. 1899. R. S. 1899, sec. 2369. There can be no doubt but that the charge of murder in the second degree includes all degrees of manslaughter. State v. Moxley, 115 Mo. 651; State v. Ludwig, 70 Mo. 415. Such has been the law in this State for almost a hundred years. Watson v. State, 5 Mo. 497; Plummer v. State, 6 Mo. 231; State v. Lane, 64 Mo. 319; State v. Burk, 89 Mo. 640; State v. Frank, 103 Mo. 122; State v. Davidson, 73 Mo. 428. This court, in the case of State v. Jennings, 134 Mo. 277, affirmed a judgment of conviction for manslaughter in the second degree, where the appellant was indicted for murder in the second degree.

GANTT, P. J.—This prosecution was commenced by the prosecuting attorney of Clark county, by information, on June 17, 1907. The prosecuting attorney of said county filed in the circuit court an amended information in due form, charging the defendant with murder in the second degree in the killing of one Joseph Murphy, on January 10, 1907, by striking, hitting, beating, pushing, knocking and by throwing said deceased with great force upon the frozen ground.

The defendant was duly arraigned and pleaded not guilty. He was put on his trial before a jury, and on the 18th of October, 1907, he was convicted of manslaughter in the second degree, and his punishment assessed at imprisonment in the penitentiary for a term of five years. Within due time he filed his motions for a new trial and in arrest of judgment, which were overruled, and he duly excepted, and was sentenced in accordance with the verdict of the jury, and from

that judgment and sentence he has appealed to this court.

The evidence on the part of the State tended to prove that the deceased, Joseph Murphy, lived on a farm with his wife and children about two and a half miles southwest of the town of Luray, in Clark county, and had lived in that vicinity for more than thirty years. He was about fifty-four years of age at the time of his death, and was about five feet six inches tall and weighed 130 pounds at the date of his death. He had become stooped and weakened by sickness at the time of the difficulty which resulted in his death. The defendant and several witnesses testified that the weight of the defendant just prior to the date of the trial was one hundred and fifty-six pounds and he was physically stronger than the deceased. It was shown in evidence by one of the witnesses that the defendant, speaking of the deceased, said: "You know Jep, I am strong enough to handle him. I could tie him up in bed cords." The evidence tended to show that ill-feeling had existed between the deceased and the defendant for some years. It appears that about two years before the homicide, a dispute arose between them on account of the defendant having taken some dirt from the roadside next to the deceased's land, and used the same in banking around the defendant's house. The deceased, Murphy, lived a half mile west of the defendant on an adjoining farm. He owned a pasture, which lay west of his home, in which he kept his cows during the day in the winter time. Defendant owned land west of this pasture and was keeping his stock there at the time of the difficulty. On Thursday morning, January 10, 1907, between 8 and 8:30 o'clock, Murphy started to drive his cows to his pasture to the west of his house. He carried a small stick, with a leather lash tied to the end, with which to drive his cows. As he was nearing the gate to his pasture, the defendant came from the west meeting him, and

at about this point the difficulty occurred.  There were no other persons present to witness the fight.  And the evidence of what occurred there at that time consists of the facts detailed by the deceased, Murphy, in his dying declarations, and those narrated by the defendant prior to the trial to certain witnesses and by himself as a witness on the trial of the cause.  Immediately after the difficulty, the deceased, Murphy, reached his residence, bruised and bleeding, and he died on the following Thursday, January 17, 1907.  The testimony of the attending physician was that his death was caused by three blood clots on the brain, caused by the wounds and licks which he received in the encounter with the defendant.

Dr. Geezlin was called to attend the deceased the same day that the deceased received these wounds and bruises at the hands of the defendant.  After the death of the deceased a post-mortem examination was made by Drs. Reese, Callihan, Crumley and Geezlin.  The last mentioned physician described the wounds of the deceased and testified as to the cause of his death.  He testified, first, as to the condition in which he found him when he was first called to treat him, and said he found him suffering from injuries of the head and chest.  There was a bruise on each side of the head, in front and back of the ear on the left side, and the one on the right side at the front of the ear was the heaviest, and an abrasion over the eye; the eye was swollen shut.  That he had an abrasion on the nose; nose was exuding a bloody serum.  His mouth was badly swollen and his lips were cut.  His throat was pretty badly discolored.  There was evidence of violence on the throat.  He could not state the internal condition of the throat, because he could not see down into it on account of the swelling.  He complained of pains in the entire head and face.  He examined him carefully and could find no fractures, and he thought it was possibly just heavy bruises.  He

could not determine the extent of the injuries from the symptoms manifested that day. He called the next day and found him rather irrational at times, rather flighty, manifesting symptoms that indicated more serious injuries than he had at first thought. He also called the next day, Saturday. He found Murphy had trouble in swallowing and could not talk distinctly, his speech was interfered with, and he was suffering more with his back. He found him in a semiconscious condition, indicating a contusion of the brain. He next saw him on Sunday evening, when he thought the conditions were improving some. He could talk some better, and the physician told the family that if there was no inflammatory reaction he might possibly get along. He did not call on Monday, but saw him again on Tuesday and found then that he had fever. His temperature had gone up to about 102, his pulse more soft, somewhat rapid, but it was firm. He next saw him on Wednesday and found that he was growing rapidly worse. On Thursday, he found him in a dying condition. He testified that he assisted in the post-mortem examination and found there were three blood clots on the brain, which were produced, in his judgment, by direct blows on the head. He also concluded from his examination that there was violence used on the throat of the deceased because of the discoloration and the swelling of the tissues. In his opinion the blood clots that had formed on the brain caused the death of Murphy, the deceased. And these blood clots were caused by direct blows.

The testimony developed that Mr. Murphy died on Thursday afternoon, January 17, 1907. About nine o'clock on Tuesday night, prior to his death, the deceased sent for Mr. Chasteen to come and write his will. After the will was properly prepared and signed on that night, the deceased made a detailed statement of the trouble between himself and the defendant, and over the objection of the defendant this statement was

admitted as a dying declaration. Mrs. Murphy testi-
fied as follows:

"Q. About that time' did your husband make his
will? A. Yes, sir; on the 15th.'

"Q. Who came to make it? A. Mr. Chasteen.

"Q. What did he say about whether or not he
would get well or not at that time? A. He told Mr.
Chasteen he thought the next time he heard from him
he would be hauling him to his grave—that he wouldn't
get well—didn't have any hopes of his ever getting
well."

This was on Tuesday night before his death on
Thursday. She was then asked what Mr. Murphy said
at that time as to how this difficulty happened to come
up. To this question, defendant's counsel objected,
because the same was incompetent or not competent
as a dying declaration, and too remote as a dying dec-
laration, which objection the court overruled and ex-
ceptions were duly saved. Her answer was:

"He stated it came up about the hedge fence. He
was going up the road and he met Mr. Colvin, and
Colvin spoke to him and he did not make him any an-
swer, but passed on. And after he got some ten or
twelve feet past, Colvin stopped and spoke to him
about the hedge fence; told him he wanted him to trim
it, to which deceased replied, 'It is none of your busi-
ness about the hedge.' Colvin said, 'I will make it my
business.' Murphy said, 'I says, I think it will be trim-
med by the time you get that dirt hauled back on my
side of the road.' Then Colvin said, 'You do not mean to
say I stole that dirt, do you?' and Murphy replied,
'You have got nothing to show, not a scratch of a pen,
to show you had a right to take it in any other way.'
At this Colvin got mad and called him a liar, or some-
thing of that kind and rushed at him, right into his
face with his eyes glared at him, and Murphy struck at
him with a whip and then Colvin struck him and knock-
ed him down and he (Murphy) said as near as he

could tell they both struck at about the same time. Colvin knocked him down and beat him in the face several times, but he could not tell just exactly just how many."

She was then asked what else Mr. Murphy said about how the defendant hit him, and she answered: "He said he could not say what he had on his hands, but it felt like iron grating over his face."

Objected to by defendant's counsel.

By the court: "It is a part of the dying declaration."

Answer: "He said he could feel the iron grating over his face."

Counsel for the defendant again objected to the statement in regard to the irons, whereupon the court sustained the motion to strike out the part of the testimony about the irons grating over his face.

She was then asked, "was anything said about letting him up," and she answered: "Yes, sir; he asked him about two or three times to let him up; asked him to let him up on his feet to have a fair chance with him, and he hit him after he got up on his feet."

This statement was made on Tuesday night before the death of Mr. Murphy on Thursday. On Wednesday morning he began to grow worse; was very drowsy all day and talking out of his head and remained that way until the last; did not seem to notice any thing much.

Another witness, John Weaver, testified that he was present when the will was made. He was asked this question: "What did he say then as to whether or not he had any hope of life?" and he answered, "He said he would not live." This statement was made on the night of the 15th, and he thought he died on the 17th. "He told Chasteen the next time they heard of him they would be hauling him to his grave." This witness then was asked to state what Mr. Murphy said

as to how the trouble occurred, to which the defendant's counsel objected on the ground that it was incompetent, the facts not being such as to show it competent as a dying declaration. The witness then proceeded to say that Mr. Murphy said, after making the above statement to Chasteen: "He was taking his cattle to the pasture and met Mr. Colvin; he spoke to him first and Murphy said he did not say anything; that he went on about ten feet and then he spoke to him about wanting him to trim the hedge fence. Murphy answered he would trim the hedge, well he spoke to him the second time about wanting him to trim the hedge fence, and he said he would have the hedge fence trimmed by the time he put that dirt back in the road that he put around his house. Mr. Colvin wanted to know if he said he stole that dirt, and Mr. Murphy said he did, and Mr. Colvin called him a liar and said he always had been a liar, and said he—when he turned around Colvin was right on to him and he struck him and they both struck about the same time, do not know whether he hit him or not, but he said he struck with all his might." The witness said then there was a part of his statement he did not understand because there was a noise in the room. He was asked, "What further?" Answer: "It was asked what he hit him with and he said he hit him with knucks." This was objected to by the defendant's counsel and the objection sustained by the court and the answer excluded.

Roy Lipper testified that he was present at the time Mr. Murphy made his will. "He (Mr. Murphy) said he was going to die, said he could not get well." "Q. After making that statement, did he make a statement of the difficulty? A. Yes, sir." The witness then proceeded to say: "Well, Murphy said he was taking his cows to the pasture and met Colvin, and Colvin spoke to him and he did not speak, he went right on, said he passed him some feet and Colvin stopped and told him he wanted him to trim the hedge, and Murphy

told him he did not have to trim that hedge; he had two years to trim that hedge and the time was not up yet, and Colvin told him he did have to trim it and Murphy told him he would trim the hedge by the time he got the dirt back in the road that he took away from his side of the road and put around his house, and Colvin asked him if he meant to say that he stole that dirt and Murphy said he did not have a scratch of a pen to show that he had any right to it, and Colvin called him a liar three times and Murphy told Colvin he was a liar and Colvin rushed at him and Murphy said he tried to defend himself as well as he could with his whip and just as he struck at Colvin, Colvin struck him and knocked him down and that Colvin hit him with a pair of knucks." The court excluded the statement as to the knucks, from the jury.

John Chasteen testified that he wrote the will of the deceased for him and (referring to Murphy) "after I had written his will, I shook hands with Mr. Murphy and bid him good-bye and told him I hoped I would hear of his being better in a few days, and he said, 'The next time you hear of me I will be on my way to my grave.'" Q. "Did he call you back and make a statement to you about the difficulty?" A. "Yes, sir; when he called me back he asked me for my advice as to whether he had better commence suit against Colvin now or wait until he was dead and let the State prosecute him. I told Mr. Murphy, I did not feel competent to advise him, and in fact I had not heard his side of the trouble, and he said, 'I will tell you how it was,' and he went on and told me. He said he was driving his cows to the stalk field that morning and he met Mr. Colvin in the road and Mr. Colvin spoke to him and he said: 'I did not answer him, he passed by me a few steps and asked me when I was going to cut that hedge. I says, I told him, that it was not any of his business about the hedge.' Mr. Colvin says, 'I will make it my business.' Murphy says: 'I have two years to cut

State v. Colvin.

the hedge in and the time is not up until spring, but I will have the hedge cut by the time you get the dirt back in the road that you took out of the road and put around your house.' Mr. Colvin said: 'Do you mean to say I stole the dirt?' Mr. Murphy says: 'You cannot show me where you have got any title to it, and where else could you get it?' He said at that Mr. Colvin flew mad and rushed at him, and near as he could tell they both struck about the same time. Mr. Murphy said he had a whip he was driving his cows with and he struck Mr. Colvin with that, and Mr. Colvin knocked him down. I asked Mr. Murphy if he thought he hurt Mr. Colvin and he said: 'I do not know, but I struck him as hard as I could. He knocked me down and beat me up in the condition you see I am in now.' " This witness also started to detail what Mr. Murphy said about the knucks, but the court stopped him and excluded that. On Thursday morning this witness was sent for to take the dying statement of Mr. Murphy, but when he reached his house he was unconscious.

Joseph Kirner testified that he saw the throat of the deceased before he died, on Thursday, after he had been shaved or his whiskers had been trimmed, and it was bruised. That same day he met the defendant. He stated that he thought he could compromise the matter and went to see the defendant. He did not expect Murphy to die at that time. He told the defendant he would like to settle this trouble between them, but the defendant did not much like to do it, said that he had been worrying him for a number of years, and he was going to take it to the law and let the law settle it. "I talked to him a little bit, and he agreed if I would get someone they would settle it. I told Allen (the defendant) to state to me just the way this happened and he said 'Jet, I have not told any one yet, but if you will take that on your shoulders to set-

226 Sup—30

tle, I will do it.' He went ahead, he said he had taken the cattle to an upper field on his 160 acres lying west of —— pretty near a mile ——. He had taken the stock up in the field and Mr. Murphy has an eighty adjoining his, and Murphy had taken his up after Colvin had taken his up. He met Murphy on the way coming back and they met right at the gate where Murphy turned his stock in, well, first he said when he saw Murphy coming, he made up his mind to ask him to trim the hedge fence between them, the partition fence, and he said he felt like there would be trouble and he prayed that the Lord would clear up the way; that there would not be any trouble. Said he passed Mr. Murphy, bid him the time of day and Murphy did not speak, went on a few steps and he said, 'Joe, I would like for you to cut that hedge,' and he says 'You tend to your own business, I will cut the hedge when you bring back that dirt that you have taken from my side of the road.' Said he then went on a step or two and Murphy came at him with a whip and struck at him, and as he was going to strike him the second lick, he said, 'I took him one and knocked him in the road-grader ditch.' He said he got up and helped him up and asked to pay his doctor's bills and asked to help him home, and Murphy said he did not need any of his help, and walked on slowly ahead of him until he got to his home.'' Witness continued: ''I asked him three or four questions, and I said, 'Of course Allen, you were mad and let your temper overcome you and you hit him more than you think for,' and he says, 'No, Jet, I was not the least bit mad, I know I did not hit him more than three or four licks.' '' The witness testified that at another time, that was the second year he lived there, the witness and Albert Smith helped the defendant butcher and he was telling witness about this road business or dirt business. ''Mr. Colvin had taken some dirt away from his side of the road to bank up against his house, from on Murphy's side, and Mr. Murphy got

mad at him for that, and the way it was, Mr. Murphy
had met him after he seen that this dirt was taken
away and asked why he took that dirt, and he came
at him with his fist all doubled up like he was going
to hit him, and Colvin says, 'Look out Joe, I will knock
your head off of you.' And Murphy asked him who
paid the taxes on that dirt, and he says, 'I don't know.'
He went on and said that—he said, 'That is the way,
Mr. Murphy, he will get the praise for being a brave
man and I will get the abuse of being the coward. I
did not want to fight the man, I am strong enough to
handle him, I could tie him up in bed cords.' Then
Mr. Smith spoke to him and quoted a few verses of
Scripture to him and he says, 'It is mighty hard for
a fellow to take all this, but,' he says, 'I made up my
mind if he makes any pass the next time I am going to
turn him heels over head.' '' Witness testified further
that at the time he asked the defendant about the dif-
ficulty, defendant said: ''I do not feel a bit condemn-
ed, I feel that my conscience is perfectly clear.'' In
regard to the physical condition of Mr. Murphy the
witness said he was a small man, ''I judge he would
weigh 135 pounds. Last fall he was real feeble, not
near as stout as he had been since the time I knew
him. He was the oldest man for his age I ever saw, he
was frail for his age.''

Leonard Kirner testified that he heard the defend-
ant make a statement as to the difficulty. ''He said he
was up to his upper place and that he was coming
home and seen Murphy coming up driving his cattle
and he said he made up his mind that he would ask
him to cut that hedge; said he prayed for him; said
he felt like there was going to be trouble, and he went
on and met Mr. Murphy and he spoke to him and Mr.
Murphy did not speak, and he said, 'Joe, I would like
for you to cut that hedge,' and he said Mr. Murphy
said, 'You tend to your own business and I will tend
to mine,' and he said at that Mr. Murphy cursed

him and began to come at him, and he said, 'stand back,' and he kept on coming, and he put his hand out to knock off the lick and he took him one, and he says he got it. Then Murphy says let him up, and he got up and helped Murphy up and wanted to take him home, but Murphy said he did not need his help and he, Colvin, wanted to pay his doctor bills, wanted him to send and get a doctor and he would pay his doctor bills, and he said he walked along slowly to the house to see that Mr. Murphy got home. Jet asked him, 'I expect you was mad and let your temper get away from you?' and he said, 'No, I was not the least bit mad and more than that, I do not think I hit him more than three or four licks.' He said he did not feel one bit condemned, felt like he was perfectly clear in the sight of God."

W. A. Kearns testified that he heard the defendant make a statement about the deceased.. "It was about two years ago, the witness was repairing the fence between him and Murphy, and between his orchard and our pasture, and Colvin come driving along the road and stopped and spoke to me (witness), and says: 'Your life is in danger over there, I came pretty near getting whipped yesterday morning out here in the road." And I says, "Is that so?" We talked on and he says, "I wouldn't fight Mr. Murphy. I told him I had laid all that down at the altar and would not fight.' I don't know now whether he said Mr. Murphy called him names, but I spoke up, and says, 'I don't know as a man would come up and stick his fist under my nose,' and he says, 'If I ever get another chance at him, I will knock his d—— head off.' "

Byrom Combs testified that he heard the defendant say he had had trouble with Murphy about moving some dirt off of the public road, said he told Murphy he would fool with him sometime and he would lift the top of his head off.

Dr. H. S. Reese, the coroner of Clark county, tes-
tified and corroborated Dr. Geezlin as to the three blood
clots being the cause of the death of Murphy, and that
in his opinion they were caused by a blow made with
some instrument.

Dr. A. C. Crumley also testified. He took part in
the post-mortem examination and he fully corrobor-
ated Dr. Geezlin's statement of the result of that ex-
amination, and gave it as his opinion that the blood
clots were caused by bruises and caused the death of
Mr. Murphy.

Dr. Geezlin also testified in regard to certain state-
ments made to him by the defendant. He saw the de-
fendant on his way back from his first visit to the
deceased after he was hurt. Defendant asked him the
condition of Mr. Murphy, and the doctor told him at
that time he thought he was pretty badly bruised up,
but did not look upon it as being serious. Defendant
said he was pretty badly bruised up, but he thought
he would get over it all right; that he had been bruised
up that way himself. He said he did hit him pretty
hard, but he was surprised when he seen him fall; he
was surprised when he fell so quick, and the doctor
said, "Yes, but that was not the end of it," and the
defendant said, "No, I did hit him more than once."

The defendant testified in his own behalf, and his
version of what occurred on January 10, 1907, was sub-
stantially as follows: "I had left my home on foot,
and went up to feed my cattle and was coming back;
had come out of my field, and come down about a quar-
ter to the quarter bend, past Mr. Murphy's land, and
met Murphy. He was coming up on the north side of
the road and I was coming down on the south side.
He was here (shown a map of the neighborhood)."
Having pointed to where the house and pasture were,
he said: "I left here (indicating on the map) and
came right down to this road running north and south.
This road runs north and south, right here, I come

on down to here, here is Mr. Murphy's, and here is where he was going to put his cattle in. This is the hedge I spoke to him about. I came out here and came on down the road. The road was frozen. Mr. Murphy was coming on this side of the road, and he crossed over and come down in front of me. This hedge is about ten or twelve feet high. Mr. Murphy passed right along here and as he passed by, I said, 'Good morning,' or 'Good morning, Joe,' I do not know which. He did not speak, I said to him, 'Mr. Murphy, I would like for you to trim that hedge sometime this Spring.' He just grabbed his whip and says 'What in the h——— is it any of your business; get that dirt back in the road.' He grabbed his whip and ran up to me and I stepped back and says, 'This is the second time, Joe,' and he laid it to me right across here (indicating) with the whip, grabbed it in both hands and hit me, and I hit him and he fell down. I would not have known at that time where I struck him, but afterwards, I found that I struck him right about here (indicating). He fell down back across, with his head on the edge of the bank of the ditch. I stood there a moment half staggered and stepped back and fell over in the ditch. He was getting up when I staggered over, and he came right over and struck at me with a whip. He was up in advance and I held him off with this arm until I got a chance to hit him again. The second time he turned around and fell over this way.

"Q. What eye did you strike the blow on? A. This eye right here (indicating). Mr. Murphy says, 'Let up on that,' and this eye (indicating) was black and a little bit of an abrasion right here (indicating). He fell the first time rather bias, in a southeasterly direction.

"Q. The point shown here, he struck how with reference to where he stood? A. Considerably lower down. Twelve or fourteen inches, I suppose. It was muddy the day before, could hardly get any where with

a wagon, and that night it froze up. He fell on the hard frozen ground when I knocked him down the second time. Then he said, 'Let up on that.' I took him by the arm and helped him up and said to him, 'Joe, I am awful sorry I had to do this,' and he said, 'Well, you had no business to say anything about the hedge.' I says, 'Well, I spoke to you two years ago about the hedge up by the gate, and I expected the same reply,' and we talked there. He said again, 'You had no business to say anything about the hedge,' and he said, 'Another thing, you got no business on my land.' I asked him where. He said, 'You rode in there and sent a man down to my house for dinner.' I told him, 'I went in and asked the thresher if he wanted to eat dinner at my house, and he said no.' They were preparing dinner down at his house, and that man, Mr. Smith, is now dead.

"Q. You were expecting the machine to come down there to your house? A. Yes, I was going along and stopped in to see; I wanted to see if they would be there for dinner." Asked if Mr. Murphy was disposed to fight further after the fight, he answered: "Something was said about the dirt, he snatched his whip around and cursed me. The last words I heard him say were: 'You G—d—s—of a b—, I will shoot you yet.' He went from there on up to put his cattle in and came on right down after me and stepped off in quite a little spry walk, a dog trot you might say. I come right on down the road home and looked back when I got pretty well on, and he was coming on, gaining ground on me, and when I got down and pretty near the house I saw that he was gaining ground, and I walked on pretty brisk so as not to have any more trouble. I offered to help him home and send for a doctor. I struck him with my right hand." Asked whether he had his mittens on or not, he answered: "I think likely I did, I have no knowledge of taking them off; I think I struck both blows with my right hand. When

I told Murphy I would help him home, Murphy said he did not want any of my money or my help; he did not want any of my assistance.''

The evidence tended to show that both the deceased and the defendant were men of good reputations for peace and quiet, truth and veracity in the neighborhood where they lived prior to the date of the fatal difficulty. The defendant also offered and read in evidence the deposition of Dr. Geezlin in which he detailed the various medicines and the quantities of each which he had administered to Mr. Murphy during his illness after the difficulty.

Dr. John Punton testified he had resided in Kansas City for nineteen years and had been practicing medicine for twenty-five years, made a specialty of nervous and mental diseases; he had had ten years' experience in the Jacksonville Insane Asylum and charge of the Topeka asylum for three years. He has a sanatorium of his own in Kansas City which accommodated about forty patients. A hypothetical question was then propounded to the doctor embodying the facts testified to in regard to the difficulty itself and the blows received by the deceased from the defendant and the fall on the frozen ground. And then the testimony of Dr. Geezlin as to the nature of the injuries he found when he was called in to treat the deceased and the condition of the patient from the time Dr. Geezlin began to treat him until the time of his death, and he was then asked if the treatment which Dr. Geezlin testified he had given the deceased, was or was not contributory to Mr. Murphy's death. His answer was: ''You want to know if that treatment would be my treatment? Q. If it was proper, and if it contributed, in your opinion to the death of Mr. Murphy? A. I would not treat the patient that way. I do not think that the treatment was proper and it would have a tendency to contribute to the death of a patient under those circumstances.'' Asked which of the injuries

under the testimony he thought caused the contusion, he answered: "I rather thought the fall on the back of the head, where he fell. Q. If there had been a contusion at that time at the point where these blood clots are described as being, could a man have lived for a week and been conscious up to the 15th? A. I do not think he could." He also gave it as his opinion that the discolorations on the neck and chest of the deceased probably resulted from the blow and licks on the head. On cross-examination he was asked if he should examine a man under the circumstances described by Dr. Geezlin and find that the marks near the ears indicated that the bruises had extended to the skull, what he would think as to whether those bruises produced the hemorrhage to the brain, and he answered that they might or might not, the probabilities were they had something to do with it. Asked if the lick in the back of the head was simply an abrasion and did not go clear to the skull whether that would be a probable cause, and he answered "I think the clots had something to do with it. Q. Then if you find three blood clots as described here on the brain, the man's chance would be small? A. I do not think he had the three clots where they were described. Q. I will ask you if you found them there, what you would say about the probability of the man's recovery? A. I do not think he would live to tell the story, not twelve hours. Q. A man that lived for several days with those blood clots? A. Not in that situation. Q. Is it not true, they do? A. They do in certain situations." In regard to the treatment he said he did not think it caused Mr. Murphy's death, but it might have contributed to it. His opinion was that Mr. Murphy died from meningitis, which is due to the laceration of the tissues of the brain and possibly a seepage of the hemorrhage. In his opinion strychnine should not have been administered in the case. On cross-examination he was asked, "Taking the history of this case

as you understand it, what would have caused the hemorrhage? A. I think it came from the injury. Q. And that would cause his death in your opinion? A. Yes, sir.''

Dr. F. B. Dorsey was also called as an expert and he was asked by counsel for the defendant: ''In view of the testimony of Dr. Geezlin and the other physicians, who assisted in the post-mortem examination and the statement of Dr. Geezlin as to the treatment he gave Mr. Murphy, whether that treatment contributed or caused the death of Mr. Murphy, and he answered, 'I think the treatment was contra-indicative and would therefore necessarily be contributory to the production of death.' '' His testimony in general was to the same effect as that of Dr. Punton. Gave it as his opinion that the treatment given by Dr. Geezlin was contributory to the death of Mr. Murphy.

Dr. J. R. Bridges, an expert on behalf of the defendant, also testified that in his opinion the cause of Mr. Murphy's death was meningitis, caused by injury in the brain, which was produced probably by external violence. In this case he would say the blows produced it.

The defendant offered as witness A. M. McLane. He was asked if he ever had an injury to his hip, or upper portion of his leg, and he answered he had. ''Q. I will ask you, Mr. McLane, if the discoloration from the injury, how far down it extended, down your leg, and whether or not on both sides of it?'' To which question the counsel for the State objected, and the court sustained the objection. And the defendant excepted to the ruling of the court.

The court instructed the jury on murder in the second degree, manslaughter in the second degree and fourth degree; on self-defense and on the credibility of witnesses, good character and reasonable doubt. The instructions will be more specifically noted in the discussion of the law of the case.

I.   Numerous errors are assigned for the reversal of the judgment in this case.   It is insisted that the circuit court erred in giving an instruction on murder in the second degree.   It is conceded by learned counsel for the defendant that where a defendant has been convicted of a less offense, he cannot complain that the court erroneously instructed of the greater offense where the higher includes the less.   Conceding the contention of counsel, and it is unquestionably sound that where there is no evidence to authorize an instruction on a particular grade of offense, none should be given on such grade, it has been uniformly ruled by this court that where one has been convicted of murder in the second degree, he cannot complain of erroneous instruction of murder in the first degree.

II.   It is next insisted that the indictment for murder in the second degree in this case will not support the verdict of manslaughter in the second degree under section 1826, nor did it authorize an instruction based on that section.   We think this question has been settled so long, in this State, that we are not now called upon to review all the learning of this subject.   Section 2369, Revised Statutes 1899, provides: "Upon indictment for any offense consisting of different degrees, as prescribed by this law, the jury may find the accused not guilty of the offense charged in the indictment, and may find him guilty of any degree of such offense inferior to that charged in the indictment, or of the attempt to commit such an offense, or any degree thereof; and any person found guilty of murder in the second degree, *or of any degree of manslaughter,* shall be punished according to the verdict of the jury, although the evidence in the case shows him to be guilty of a higher degree of homicide."   In State v. Moxley, 115 Mo. l. c. 651, it was said by this court: "In an indictment for murder in the first degree under our statute, every grade and every degree of criminal homicide, from the highest to the lowest, is embraced; it is, in

short, in legal effect, an aggregation of separate and distinct counts.'' In State v. Ludwig, 70 Mo. l. c. 415, Judge HENRY speaking for the court said: ''His counsel contend that he could not, under the indictment, which was for murder of the first degree, be convicted of manslaughter of the first degree, of which the jury found him guilty. . . . It has so long been held, in this State, that under an indictment for murder, the defendant may be convicted of manslaughter, that it must be regarded as finally settled. [Watson v. State, 5 Mo. 497; Plummer v. State, 6 Mo. 231; State v. Lane, 64 Mo. 319.]'' See, also, State v. Burk, 89 Mo. 640; State v. Frank, 103 Mo. l. c. 122; State v. Davidson, 73 Mo. 428; State v. Jennings, 134 Mo. 277. That there may be certain sections defining ''manslaughter,'' which should be prosecuted by an indictment based upon the provisions of the specific section, we have no doubt, but where the indictment, as in this case, charges the homicide to have been committed by violence, we have no doubt whatever that the section of the statute 2369 applies to a case like this, and if the facts and evidence justify an instruction on manslaughter in the second degree, the indictment is sufficient to support the judgment under proper instructions defining that offense. This has been the uniform ruling on this question and we see no reason for disturbing it.

III. We are thus brought to a consideration of the instruction itself, which the court gave in this case on manslaughter in the second degree. That instruction is in these words: ''The jury is instructed that manslaughter in the second degree is the killing of a human being without a design to effect death in a heat of passion in a cruel or unusual manner, unless it be committed under such circumstances as to constitute excusable or justifiable homicide. Now, if from all the facts and circumstances given in the evidence you believe beyond a reasonable doubt that the defendant

feloniously and willfully assaulted Joseph Murphy
and beat him in and upon the face, head and body
in a cruel and unusual manner and from the effects
of said blows so struck by the defendant, or from a fall
upon the ground occasioned by the blows so struck by
the defendant, the said Joseph Murphy within one year
thereafter died, and if you further believe that such
assault was committed and blows struck by said de-
fendant under such circumstances as not to constitute
excusable or justifiable homicide as defined in these in-
structions, then you will find the defendant guilty of
manslaughter in the second degree and assess his pun-
ishment at imprisonment in the penitentiary not less
than three or more than five years.''

It will be observed that manslaughter in the second
degree is defined in the exact language of the statute,
but in submitting to the jury the facts, which they
should find and believe, the circuit court omitted from
the instruction the words ''without design to effect
death, in a heat of passion.'' That these words are an
essential element of the statute in order to constitute
manslaughter in the second degree, we think is too
obvious for discussion.

Heat of passion is a necessary element of man-
slaughter under section 1826, and section 1828 and
1833. Learned counsel for the State, while conceding
that this phrase is omitted from the instruction, in-
sists that inasmuch as it is correctly defined in instruc-
tion number 15 given at the request of the defendant,
he cannot now be heard to complain because instruc-
tion number five did not define this same phrase. But
it is not a matter of definition of the phrase in this
connection, but a proper instruction as to what ele-
ments were necessary to constitute manslaughter in
the second degree under section 1826, under which un-
questionably the court was submitting the case to the
jury.

Equally important in defining this offense under section 1826 were the words "without a design to effect death." We cannot agree with the Attorney-General that the defendant was benefited in any manner by the omission of these essential words and therefore cannot complain. Before any one can be convicted of a crime under our law, he is entitled to have a jury properly instructed as to the elements of the crime for which they are to try him. It was of the very essence of this offense, this degree of manslaughter, that it must not have been an intentional killing. In State v. Edwards, 70 Mo. l. c. 482, this court, in treating of an instruction practically in the language of section 1826, said: "It is manifest from the testimony that the killing was intentional. It could not, therefore, be manslaughter in the second degree, as defined by this instruction. Nor do the facts tend to show a case of manslaughter in the second degree as defined by section 12 hereinafter quoted. The defendant was either guilty of murder in the second degree or of manslaughter in the fourth degree, or the homicide was justifiable. Under our statute, manslaughter in the fourth degree includes every homicide not justifiable or excusable, which was manslaughter at common law, and which is not declared to be manslaughter in the first, second or third degree. [Wag. Stat., sec. 18, p. 447.] The unnecessary killing of another while resisting an attempt by such other person to commit a felony, or to do some other unlawful acts, after such attempt shall have failed, is declared to be manslaughter in the second degree. [Wag. Stat., sec. 12, p. 447.] With the exception of those cases of intentional killing which may come within this provision, no case of intentional homicide is included either in the first, second or third degree of manslaughter." It was accordingly held that the instruction as to manslaughter in the second degree

was erroneous. To the same effect is State v. Curtis, 70 Mo. 594.

As the defendant was convicted of manslaughter in the second degree, and this is the only instruction which defines that offense or attempted to define it and was clearly erroneous, the judgment must be reversed for the error therein, if for no other reason.

In another respect the instruction was faulty in that it required the State to show that the beating was "in a cruel *and* unusual manner," whereas the statute only required the killing to be in a cruel *or* unusual manner. Of course this was not harmful to the defendant in that it required the State to prove more than was necessary. Proof of either alternative would have met all the requirements of the statute.

Much has been said by the learned counsel for the defendant as to what constitutes a cruel or unusual manner within the meaning of this section, and it is contended that the evidence did not justify the submission of that offense to the jury, because, it is argued, the manner of the killing was not cruel. In State v. Gassert, 65 Mo. 352, this court said: "In this case there was an altercation between defendant and deceased, and in the heat of passion defendant struck deceased a blow on the head with a stick, which resulted in the death of the deceased. The court was asked to instruct the jury in regard to manslaughter in the second and third degrees, which the court refused. We are of opinion that the jury should have been instructed as to manslaughter in the second degree, and because the court refused so to instruct and told the jury that whether defendant intended to kill deceased or not, they might find him guilty of murder in the second degree, the judgment of the Court of Appeals is reversed, and the cause remanded to the St. Louis Criminal Court." In other words, the question as to what was a cruel manner should have been left under the instruction to the jury, and such seems

to be the construction given similar statutes in other states. [Keenan v. State, 8 Wis. 132.] The courts have wisely refrained from attempting to define what shall constitute a cruel or unusual manner of killing. We think the court did not err in not attempting to define either of those words. They are words in common use and it is for the jury to apply them to the facts in each particular case as it arises, and an attempt to define them would more likely confuse than assist the jury in reaching a proper conclusion. In People v. Pearce, 2 Edmond's Reports of Select Cases, 76, the court of oyer and terminer, under a statute very similar to our section 1826, held that though the homicide be effected with a dangerous weapon, so as to be manslaughter in the third degree, yet, it might be in the second degree if the death was effected in a cruel or unusual manner. In that case the prisoner killed the deceased by striking him five or six times with a club on the back of the head. And to the like effect is People v. Webster, 68 Hun 11. Nothing we have said herein in regard to what constitutes a cruel or unusual killing, in our opinion, conflicts in any way with the conclusion reached by this court in State v. Wilson, 98 Mo. l. c. 447, 448, in which the killing appeared to have been caused by one blow with an ordinary hoe handle, in a case in which the quarrel arose of a sudden, and it was held that such a killing could not have been said to have been done in a cruel and unusual manner.

IV. In regard to the assignment based on the giving of the seventh instruction by the court, it must be conceded that this instruction was most unhappily and inartistically drawn. But the defendant obtained a full and favorable instruction in his instruction number one which the court gave at his request. The giving of the instruction number seven under these circumstances would not have constituted error, though it should be avoided in the future.

·V. In detailing the statement made by the deceased, several of the witnesses testified that the deceased said that when the defendant was striking him, it felt like iron scraping on his face, and others that it felt like knucks. The defendant objected to the statement in regard to the knucks, for the reason that the information charged that the blows were inflicted by the fist. When the objection was first made, the court permitted it to go in because it was a part of the dying declaration, but when his attention was called by the defense to the allegations of the information, he sustained the objections and directed the jury not to consider the knucks at all. Afterwards when he came to instruct the jury the learned circuit judge expressly withdrew from their consideration all the evidence in regard to knucks. It is insisted that, notwithstanding the court withdrew the evidence and instructed the jury not to consider anything said about knucks, this constituted reversible error. Inasmuch as the cause must be reversed for other error it is unnecessary to decide whether, under the circumstances, this constituted reversible error. If the cause should be retried, the counsel being fully advised on this point, this error, if error, can be avoided by cautioning the witnesses and by refraining from asking for this item of testimony.

VI. By far the most serious point urged for the reversal of the judgment in this case, is the admission of the statements made by the deceased on Tuesday night before his death Thursday evening as dying declarations.

The rule in regard to the admission of this character of testimony is well settled in this State. In order to justify the admission of dying declarations the impression of impending and immediate death and the absence of any hope of recovery is essential to the admission of such dying declaration. It is the ap-

plication of the rule which has often caused the courts
the most serious consideration.  It has been ruled by
this court that such declarations are admissible from
the necessity of the case and to prevent a failure of
justice, and are therefore properly restricted to the
identification of the prisoner and the deceased and to
the act of killing and the circumstances immediately
attending said act and forming a part of the *res gestae*.
It has also been ruled that the admission of this char-
acter of testimony is no infraction of the constitutional
provision that the accused should be confronted with
the witnesses against him.  In State v. Brown, 188 Mo.
l. c. 460, 462, it was said by Judge Fox for this court:
"There is no subject connected with the administration
of the criminal laws of this State that has more fre-
quently had the attention of this court than that of
the admissibility of dying declarations in cases of homi-
cide.  Upon this subject this court has dealt with every
form of objection which could be conceived by the in-
genuity of the legal profession, and as to the underly-
ing principles which authorize the admission of this
class of testimony nothing can be added to the repeated
and uniform expressions of this court.  The funda-
mental rule governing their admissibility is that it must
appear by proof adduced by the party offering such
declarations, that they were made under a sense of
impending death, and it is sufficient if it satisfactorily
appears, in any mode, that they were made under that
sanction.  No particular form in the statement of dy-
ing declarations is required.  As was said by SHER-
WOOD, J., in State v. Nocton, 121 Mo. 550: 'A declara-
tion may be received in evidence even without such
formal statement.  Thus, though it is essential to the
admissibility of these declarations, and is a prelimin-
ary fact to be proved by the party offering them in
evidence, that they were made under a sense of im-
pending death; but it is not necessary that they should
be stated, at the time, to be so made.  It is enough, if

it satisfactorily appears, in any mode, that they were made under that sanction; whether it be directly proved by the express language of the declarant, or be inferred from his evident danger, or the opinions of the medical or other attendants, stated to him, or from his conduct, or other circumstances of the case, all of which are resorted to, in order to ascertain the state of the declarant's mind. The length of time which elapsed between the declaration and the death of the declarant furnishes no rule for the admission or rejection of the evidence; though, in the absence of better testimony, it may serve as one of the exponents of the deceased's belief that his dissolution was, or was not, impending. It is the impression of almost immediate dissolution, and not the rapid succession of death, in point of fact, that renders the testimony admissible. [1 Greenleaf on Ev. (14 Ed.), sec. 158; 3 Russell on Crimes (9 Am. Ed.), 250; 6 Am. and Eng. Ency. Law, p. 108, et seq., and cases cited.]' " The same general principles have been recently reaffirmed in State v. Kelleher, 201 Mo. l. c. 637; State v. Craig, 190 Mo. l. c. 338.

Now then, applying these principles to the declarations admitted by the court in this case, it appears that the circuit court adopted the practice so often approved by this court, of first hearing the testimony as to the circumstances under which the deceased made the said statement before admitting the same to the jury. Mrs. Murphy testified that her husband made his will on the night of the 15th of January, 1907, after nine o'clock that night. It appears from the testimony of Mr. Chasteen that he was sent for that night to write a will for the deceased, and went to the latter's residence, and about nine o'clock or after he did write a will for him, and after the will had been written and attested Mr. Chasteen bade the deceased "Good-bye," and told him he hoped he would hear of his being better in a few days, to which the deceased

replied: "The next time you hear of me I will be on my road to my grave." At that time the deceased also asked Mr. Chasteen whether he had better commence suit against Colvin (the defendant) now, or wait until he was dead, and let the State prosecute him. Mrs. Murphy testified that she was present on that occasion, and her version of what the deceased said was: "He told Mr. Chasteen he thought the next time he heard from him he would be hauling him to his grave; that he would not get well, and did not have any hopes of ever getting well." Roy Lipper testified that he was there on this same occasion when the will was made and heard the deceased say, "He was going to die, said he could not get well." John Weaver was also there and he testified: "Right after his will was made, he told Chasteen the next time they heard of him they would be hauling him to his grave." Now, it appears from the testimony of the physician, Dr. Geezlin, that he became alarmed about the condition of the deceased on Tuesday on account of the fever that existed. On his first visit to him on Thursday he found him badly bruised up, but he did not consider the case serious, but on Friday he found him irrational when he visited him about two o'clock of that day; he was flighty and manifested symptoms that indicated that his injuries were much more serious than he thought at first. On Saturday he had trouble in swallowing and could not articulate his words. He was in a more unconscious condition, and he diagnosed this as a contusion of the brain. On Sunday evening his condition seemed a little better, and the doctor stated that if no inflammation set in he might possibly get along. He did not see him again until Tuesday, when he had fever, and his temperature had run up to 102, indicating inflammation had taken place in the brain, and on Thursday afternoon he died. The other testimony tended to show that on Wednesday morning he relapsed into an unconscious condition and

remained that way until his death on Thursday afternoon.  The doctor testified that when he was aroused on Tuesday he talked in a conscious way.

As already stated he sent for Mr. Chasteen Tuesday night and had him prepare his will about nine o'clock, and the alleged dying declarations were made that night after Mr. Chasteen had drawn his will and it had been witnessed.  The question is did these circumstances and these statements of the deceased justify the admission of his declarations as to who caused his wounds and the circumstances under which he received the same.  The learned counsel for the defendant draw the conclusion that because deceased had dictated his will to Mr. Chasteen that night he was not under any serious apprehension of impending death; that had he been so impressed he would not have been thinking of making a will.  We are unable to concur in this view at all.  On the contrary we have drawn the conclusion that he was conscious that his end was near and his desire to provide for his family impelled him to send for this neighbor, in the nighttime, to prepare his will and last testament, lest he would not be able to do so if he deferred the matter any longer.  This circumstance is corroborated by his statement, when this neighbor bade him "Good-bye" that night, and expressed a hope that he would soon be better, that the next time his neighbor heard from him they would be hauling him to his grave, and by the further statement made, as testified to by Mrs. Murphy, that he would not get well, did not have any hopes of his ever getting well.  That his fears were well founded, appears from the testimony that next morning he became unconscious and remained in that condition until his death on Thursday afternoon.

This court has on several occasions recently approved the doctrine announced by Judge Sherwood in State v. Nocton, 121 Mo. 550, that it is not essential to the admissibility of a dying declaration that

the deceased should have made the formal statement his death was immediately impending, but that if it satisfactorily appeared in any mode, from his conduct or other circumstances of the case, that he made these statements under the sense of approaching death it is sufficient. We attach no significance whatever to the fact that Mr. Chasteen was sent for on Thursday to take a formal dying declaration, as the deceased at that time was in an unconscious condition and all the circumstances indicate that some one of the family or some other person sent for Mr. Chasteen and not the deceased. While it does not appear that the physician informed the deceased that he regarded his condition as critical and that he could only live a short time, it does appear that the physician in charge and another physician were resorting to extreme efforts to keep him alive at that time, from the character of the medicines they were administering and the hypodermic injections they were resorting to. An intelligent man might form his own conclusion from the conduct of the physicians themselves. And it seems quite apparent to us that the deceased did draw the correct conclusion from their conduct from the fact that that very evening he sent for his neighbor to prepare his last will and testament, and made the statements to which we have referred and alluded, the fact that the State might be called in to prosecute the defendant for his assault after he was dead. Making all due allowances for the different manner in which men express themselves, we have come to the conclusion that these statements were properly admitted as dying declarations.

As to the contention made by the learned counsel for the defendant that Mrs. Murphy did not hear these statements because Mr. Chasteen testified that he was quite sure she was not in the room, we think that is a matter peculiarly within the province of the jury to determine and this court would not be justified in

excluding her evidence by assuming that she did not hear what she testified to, or that Mr. Chasteen was absolutely correct in saying she was not present when he heard practically the same statement to which she testified. We think the correct ruling was announced in State v. Hendricks, 172 Mo. 1. c. 670, 672, wherein Judge Fox said: "As this case is to be retried we suggest that the court admit only such statements of William C. Hipes as, upon the proper foundation being laid, are in fact dying declarations. Then submit to the jury the question as to whether such declarations were in fact made, and if made, the rule that should guide them as to their weight and influence in reaching a verdict." In State v. Kelleher, 201 Mo. 1. c. 637, the deceased, after being shot, ran into Bumberry's saloon and requested Bumberry to send for a priest and a doctor. To Howard, who was taken to see him, deceased said: "Johnie, I am a croppy, I am a dead one; there ain't nothing to it." At the hospital, when his declaration was about to be taken, he said that it was all off with him. Speaking of these things, Judge BURGESS said: "These remarks and statements, taken in connection with the attending circumstances, the condition of the wound and the deceased's state of mind from the first, show that the declaration was made under the impression of almost immediate dissolution." In State v. Craig, 190 Mo. 1. c. 338, 341, Judge BURGESS said: "While deceased said nothing as to when he expected to die, the question was not asked him, nor was it necessary for the admission of the declaration in evidence that he should have made a formal statement that he was without hope of recovery." In this case the deceased did say that he would not get well and that the next time that his neighbor heard from him they would be hauling him to his grave. We are unable to make any satisfactory distinction between those cases and this. We hold that the declarations were admissible in those

cases and we think they are admissible in this case.

It has frequently been ruled in this court that where incompetent statements are connected with those which are clearly competent as dying declarations, the court may exclude the incompetent and admit those which are competent, and so in this case it was perfectly proper for the court to exclude the references to the knucks and permit the remainder of the statement to go to the jury. While it is the province of the jury to determine the credit or weight to which the dying declaration is entitled, the question as to whether or not it was a dying declaration made by the deceased and admissible in evidence is a question solely for the consideration of the court and not for the jury. In this case the court heard the preliminary evidence in order to determine the admissibility of the declarations and held them admissible and we think committed no error in so doing. This ruling applies to the evidence of Mrs. Murphy, Mr. Chasteen, John Weaver and Roy Lipper, as these witnesses testified to one time and place and one statement by the deceased.

VII. The testimony of Jasper Kirner stands upon an entirely different footing. This witness was called by the State to testify to certain statements made to him by the defendant as to the difficulty between him and the deceased on Monday or Tuesday after the difficulty on the previous Thursday, and also as to the condition in which he found the deceased on Friday night, and as to certain bruises and discolorations which he observed on the neck and throat of the deceased at that time. The State did not attempt to elicit from this witness any statement made by the deceased, Murphy, to the witness in regard to the difficulty. Upon cross-examination counsel for the defendant asked the witness this question: "Now, did Mr. Murphy tell you in that conversation with him

there that Colvin had offered to pay his doctor bill?''
And thereupon the witness proceeded to state that he
had inquired of Mr. Murphy in regard to the doctor's
bill, telling him that a Mr. Wickam had told the witness
that the defendant had agreed to pay his doctor's bills,
and the deceased said that he did not want any of his
money. He was then asked this question: ''Now,
what was there about this dirt business that you were
testifying to in chief?'' and he proceeded to detail
that defendant had taken some dirt from the road
on the side next to the land of the deceased. He
was then asked, ''Did you ever hear Mr. Murphy make
any statements with reference to some trouble they
had about two years before this time with reference
to the dirt? What did Murphy say as to whether or not
Colvin was brave or whether he was a coward?'' He
answered: ''Mr. Colvin was the one that said that.''
He was then asked if Murphy said ''Colvin would not
fight him, that he was either a coward or dirty coward
or something like that?'' and he answered that he
could not recollect that he did: ''Q. Did you have a
conversation with Mr. Murphy about the trouble that
he had with Colvin about that dirt?'' and he answered
that he did at one time, and he was again asked
if in that conversation the deceased did not tell him
that Colvin was a coward and would not fight, and he
answered, he might have, but he did not recollect it.
Thereupon, the witness was turned over to the State's
attorney on redirect examination, and was asked:
''You spoke about something Colvin offering to pay
his doctor bills; in that conversation did he tell you
how this difficulty came up?'' A. ''He did.'' Q.
''State how Murphy told you?'' To this question the
defendant's counsel objected because incompetent.
Objection was overruled and exceptions saved. There-
upon the witness proceeded to detail substantially the
same statements made by Murphy, the deceased, in
his dying declaration. And after he had finished this

statement, counsel for the defendant objected to so
much of the statement as referred to the knucks and
the court promptly sustained the objection to the
knucks. We think there was no reversible error in
the action of the court. The defendant having called
for the conversation between the deceased and the
witness and having elicited that part thereof which
he deemed favorable to himself, the State was entitled
to the whole of the conversation. But the objection
to this testimony was too indefinite to make it the
ground of error. The objection was merely that the
question was incompetent and we have repeatedly
ruled that this is no objection at all. Moreover, after
the witness had stated what the deceased said as to
what occurred in the encounter, the defendant again
objected, but limited his objection to the knucks and
the court sustained that objection. But beyond all
this, if we are right in holding that the dying declara-
tions were admissible, this testimony was not preju-
dicial to the defendant, because it was merely cumula-
tive and was more favorable to the defendant than
the statements made by the deceased.

VIII. Error is assigned in the exclusion of the
testimony of G. W. Wilson, the witness for the de-
fendant. He was asked if he was acquainted with
the deceased, and he answered that he was. He was
then asked: "You may state what his disposition was
as to being high tempered, abusive or turbulent?"
and the State objected to this and insisted that it
must be confined to the general reputation of the de-
ceased in that regard. The objection was overruled
and the witness answered: "Well, I considered him
a little contentious." Thereupon on motion of the
State's counsel, this answer was stricken out and the
defendant excepted. He was then asked: "How as
to high temper and abusive?" A. "Well, he was
abusive with me at a couple of times, at two different
times." Q. "Did that seem about his disposition

from what you know of him?'' ''Well, yes, when he took a dislike to a man.'' On motion of the counsel of the State, this answer also was stricken out and the defendant excepted.

In State v. Feeley, 194 Mo. l. c. 318, relied upon by the defendant in support of this evidence, it was said by Judge BURGESS for this court: ''While it would have been proper for the defendant to show by testimony the general reputation of the deceased in the neighborhood in which he lived for violence and quarrelsomeness when drunk, yet, under the circumstances hereinafter to be noted, that was only one trait or quality of his disposition, which went to make up his general reputation, and not separable from it. And the State should not, therefore, be deprived of the right to show, in rebuttal, his general reputation for peace, quiet and good citizenship, in the neighborhood in which he resided.'' In that case it was also said: ''In the case at bar, defendant testified that he shot deceased because he was afraid deceased was going to kill him, and under such circumstances evidence of the character of the deceased for being quarrelsome and dangerous when drinking, was properly admitted.'' In holding that the character of the deceased for turbulence and violence was admissible it was meant that proof of his general reputation in that regard was admissible, as the whole context of the opinion, we think, demonstrates. As said by this court in Waddingham v. Hulett, 92 Mo. l. c. 534, ''a man's character is to be judged by the general tenor and current of his life and not by a mere episode in it.'' Clearly the answer of the witness Wilson went no further than to demonstrate that he had had a personal difficulty with the deceased on two occasions, and found him contentious and abusive on these occasions. What the provocation was, we know not, but this evidence falls far short of establishing that the deceased had the reputation of being a violent and turbulent man

in that neighborhood.    We think the court properly excluded these statements of the witness on this point.

IX.    The instruction number 14 given by the court told the jury that "in the absence of qualifying facts and circumstances the law presumes that a person intends the ordinary and probable result of his acts." Defendant assigns this as error.    The instruction is a correct proposition of law.    We think it could not have possibly had any effect on the decision of the case, but it might have as well been omitted.

X.    Error is also predicated on the refusal of an instruction designated as "B" requested by the defendant.    Counsel for defendant concede that the instruction was not proper, but insist that the court should have given a proper instruction on the subject. No error was committed in refusing it, and this point would have been fully covered by a proper instruction on the subject of manslaughter in the second degree.

XI.    Finally it is insisted that the court erroneously refused to admit A. M. McLain to testify to the extent of a discoloration from an injury which he had received on his own leg.    We think the court was clearly right in excluding this testimony.    A number of physicians, experts on the subject of discoloration from wounds, testified both for the State and the defendant.    No good could have been subserved by going into a history of the injury received by this witness and the effect thereof on his person.    It would have furnished the jury no test whatever as to the nature and character of the wounds inflicted by the defendant upon the deceased.

For the errors noted, the judgment must be reversed and the cause remanded for a new trial in accordance with the views herein expressed.    *Burgess* and *Fox, JJ.*, concur.